Alex C. **STOKES**

v.

**Joseph L. LECCE, Individually and as Chairman of the Pennsylvania State Horse Racing Commission.**

**Civ. A. No. 72–1258.**

United States District Court,
E. D. Pennsylvania.

Nov. 11, 1974.

Albert S. Shaw, Jr., Philadelphia, Pa., for plaintiff.

James F. Cendoma, Harrisburg, Pa., for defendant.

## OPINION

LUONGO, District Judge.

Plaintiff Alex Stokes brought this civil rights suit against defendant Joseph Lecce, charging that Lecce, acting under color of state law by reason of his position as Chairman of the Pennsylvania State Horse Racing Commission, took actions which deprived Stokes of the opportunity to work at his occupation as a horse racing official. The case was tried to a jury on January 21 through 23, 1974, and a verdict was rendered in favor of plaintiff and damages were assessed at $10,000. Before the court are (1) Lecce's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and (2) plaintiff's motion for assessment of attorney's fee.

The trial adduced the following facts. At the time of the events here at issue, Stokes had worked as a racing official for 14 years at tracks in New Jersey, Pennsylvania, Ohio, Delaware, Florida and Maryland. In the mid-1960's he began to work as a racing steward. Stewards are the highest ranking officials at a race track and are ultimately responsible for supervising the races and making them official. Their tasks include, among others, deciding whether horses can be scratched from races once

they are on the card; choosing riders for horses if the trainers or owners fail to do so; reviewing video tape replays of the races when necessary; resolving disputes in the stables and disciplining licensees. In Pennsylvania the position pays $125 per day. Stokes' reputation in the racing world as an official in general and as a steward in particular was uniformly excellent: he was regarded as conscientious and his integrity was beyond reproach.

In 1968, when Pennsylvania legalized thoroughbred horse racing (harness racing had earlier been legalized) and the State Horse Racing Commission (hereinafter Commission) was appointed, Stokes was working as a steward at Monmouth Park, New Jersey. On the recommendation of its advisor, the newly-formed Commission interviewed Stokes for the position of steward and appointed him as such in the summer of 1968. In Pennsylvania there are three stewards at every racing meet, one appointed by the Commission and two appointed by "management," i. e., the racing associations which operate the meets. Stokes was the "commission steward" at Liberty Bell Race Track and he served in that capacity until February 1972, the end of the winter meet. In January 1972, Lecce was appointed Chairman of the Commission. In the spring of 1972 Stokes learned that he was not being reappointed as commission steward.[1] In early May 1972, Howard Battle, Racing Secretary for Eagle Downs and Continental Racing Associations, the two racing associations which conducted meets at Liberty Bell Park (hereinafter-referred to jointly as the Associations or the racing associations) offered Stokes a job as a placing judge. Placing judge is a subordinate position to steward in the hierarchy of racing officials. Placing judges help the stewards to fill the racing cards. At the finish of each race, they "place" the horses with the aid of a photo finish camera. They also interpret the photo finish films. In general, the position of placing judge entails far less responsibility than that of steward and pays only $50 a day. Although Stokes had worked as a placing judge in the past, to return to the job after serving as a steward represented a clear stepdown for him. However, because he did not learn that he had lost his job as "commission steward" until shortly before the beginning of the spring racing season and he had no other job prospects, Stokes accepted the assignment as placing judge. It is this position and the fact that Stokes ultimately did not get it which is at issue in this lawsuit.

As Racing Secretary for the Associations, Battle was in charge of the actual hiring of racing officials for the Associations subject to approval by the Commission.[2]

On May 9, 1972, Phillip Baker, General Manager of Liberty Bell, and Battle's immediate superior, sent a letter to the Executive Secretary of the Commission, James LeJohn, submitting a list of racing officials for whom the Association requested approval. The name of Alex Stokes was one of six listed as "placing & patrol judges." On May 17, the Commission approved a list of officials which included all the names submitted on May 9 except that the name of John Padgett appeared in place of Alex Stokes. At trial, it became evident that Mr. LeJohn, the Executive Secretary, had physically made the change.

---

1. The failure of the Commission to reappoint Stokes as "its" steward is not at issue in this lawsuit.

2. 15 P.S. § 2660 (pocket) provides:
    "At all thoroughbred horse race meetings licensed by the State Horse Racing Commission in accordance with the provisions of this act, qualified stewards, judges and starters shall be approved by the commission. Such officials shall enforce the rules and regulations of the State Horse Racing Commission and shall render regular written reports of the activities and conduct of such race meetings to the State Horse Racing Commission. The compensation of such judges and starters shall be fixed by the State Horse Racing Commission and paid by the corporation conducting such race meeting.

The facts recited thus far are basically uncontroverted. What was in dispute at trial was why LeJohn removed Stokes' name from the list. The theory underlying plaintiff's action, which the jury apparently accepted, was that Lecce, abusing the power of his position as Chairman of the Commission, caused Stokes' name to be deleted, either by instructing the Executive Secretary, LeJohn, to remove it, or by causing Baker, the General Manager of the Associations, to instruct LeJohn to remove it.

Defendant contests plaintiff's theory of the case, arguing that Baker instructed LeJohn to remove Stokes' name but that the evidence did not show Lecce's involvement and that the jury's verdict was against the clear weight of the evidence, necessitating a new trial. Additionally, defendant argues that even if plaintiff's theory of Lecce's complicity is accepted, Lecce's action would not constitute a violation of the Civil Rights Act, and therefore judgment must be entered in his favor notwithstanding the verdict.

### 1. (a) *Motion for New Trial*

■ It is axiomatic that it is within the sound discretion of the trial court to grant a motion for a new trial when a jury's verdict is against the weight of the credible evidence. Morris Brothers Lumber Co. v. Eakin, 262 F.2d 259 (3d Cir. 1959); Sokol v. Gussack, 367 F.2d 576 (3d Cir. 1966); 6A Moore's Federal

Practice ¶ 59.08[5]. However, a review of the trial record convinces me that the jury's verdict, that Lecce, using the power of his office, caused plaintiff's name to be removed or withdrawn from the list submitted to the Commission for approval, was amply supported by the evidence.

There was testimony by Louis Baranello, who served as a racing steward appointed by the Commission at Pocono Downs and Pitt Park from July 1971 to January 1972, that around March 15, 1972, he had a conversation with Lecce in Florida concerning Baranello's prospects for appointment as a steward in the next season, and that Lecce responded that he had not yet made up his mind about Baranello or many other things, "and the only thing he was sure of at the time was that Alex Stokes would not be back." (N.T. 87; 90).

Phillip Baker, who at the time of the events in issue was General Manager of the Associations, was called by plaintiff's counsel to testify.[3] The substance of Baker's testimony was that at a meeting at Liberty Bell Race Track, Stokes was discussed, and "it was intimated [by Lecce] that it would be much wiser" if the Association "had another official." (N.T. 101). Baker went on to clarify what transpired at the meeting: "It was Mr. Lecce in that board room—I didn't say he wouldn't approve him. What I said, for the sake of harmony, he would much rather not have Alex Stokes there." [4] (N.T. 102).

---

3. Baker apparently suffered a "lapse of memory," prompting plaintiff's counsel to plead surprise and impeach his witness by reading parts of his deposition. Once the deposition was read to him, Baker's recollection was "refreshed," and he reaffirmed the statements made in the deposition. A witness' prior statement becomes substantive evidence of the facts asserted if it is adopted or repeated during his testimony at trial. United States v. Carter, 417 F.2d 229, 231 n. 8 (3d Cir.), cert. denied, 397 U.S. 399, 90 S.Ct. 1145, 25 L.Ed.2d 409 (1969).

4. The following is the full exchange at trial during which Baker adopted his deposition testimony:

"Q . . . [by Shaw] I am referring to a question on page 6 in this deposition first of all. It is a question I think by Mr. Cendoma.
'QUESTION: Were you told at that meeting then Mr. Stokes would not in fact be approved by the Commission?
'ANSWER: In actual words, no, but I was—
'QUESTION: Do you—
'MR. McDEVITT: Let him finish.
'MR. CENDOMA: I'm sorry, I thought he was.'
The you continued:
'THE WITNESS: It was intimated that it would be much wiser if I had another official.

Richard E. McDevitt, Esquire, testified that Stokes consulted him after Stokes learned that he was not to be hired as placing judge. McDevitt testified that he communicated with Lecce to find out what had happened. Lecce promised that he would investigate the matter and be in contact with McDevitt. A short while later, having heard nothing, McDevitt wrote a letter to Lecce reminding him of his promise to investigate the matter, and advising that it was imperative that Stokes' name be cleared so that he could obtain other employment as a racing official. Within a few days Lecce called McDevitt. During that conversation, when McDevitt asserted that at the very least Stokes was entitled to a hearing, Lecce cut him off, saying, "Don't tell me what to do. I'm the Commissioner." (N.T. 110). According to McDevitt, Lecce then said, "How would you like the ex-baseball team manager coming back as a coach, looking over the new manager's shoulder." (N.T. 110).

James LeJohn, who was hired as Executive Secretary of the Commission after Lecce became Chairman, testified that Stokes' name was on the list of officials which the Association submitted in early May, but that he removed it at Baker's request. LeJohn also testified that before Baker instructed him to strike Stokes' name, he tried to sound out LeJohn about whether Stokes would be approved. (N.T. 272, 275). LeJohn was non-committal on the point but denied having any particular doubts that Stokes would be approved. (N.T. 280). LeJohn denied that he had removed Stokes' name on Lecce's instructions.

Defendant Lecce, called by plaintiff as on cross-examination, testified that he was an electrical contractor and that he had had no prior connection with racing before he was appointed Chairman of the Commission in January 1972. He remembered speaking to McDevitt about Stokes, but could recall few of the details of the conversation. Lecce conceded that he might have made the "ex-manager" remark to McDevitt; he explained it by commenting that "it might be embarrassing for somebody to be replaced as a manager sitting on the same bench . . . that would make sense to me." He denied, however, caring whether Stokes got a job as placing judge, asserting that in fact he personally liked Stokes and considered him qualified for the position. (N.T. 182). Lecce denied that Stokes had been "disapproved;" rather, his name had never formally been before the Commission. Later, as part of his defense, Lecce explained his statement to Baranello (that Stokes would not be returning) as pertaining only to the position as a steward, not as placing judge. He explained this on the ground that a Mr. Robertson had already been appointed by the Commission to replace Stokes as steward. He denied ordering or directing the removal of Stokes' name as a placing judge. He did concede that LeJohn had advised

'BY MR. CENDOMA:
'QUESTION: Do you recall who made that statement?
'ANSWER: I think it was Mr. Lecce.'
'Now, does that refresh your recollection as to who made the statement?
A [Baker] At the deposition, yes, it definitely does, and, as I said then, I think it was Mr. Lecce.
         *         *         *         *         *
Q Now, Mr. Baker, I want to refer to a couple of other questions in that deposition, and here I am referring to page 10. This was a question on cross-examination by Mr. McDevitt. Mr. Cendoma has been questioning you up to that point. Mr. McDevitt asked this question:

'QUESTION: Mr. Baker, do you recall telling me some months ago it was Mr. Lecce who told you he wouldn't approve Mr. Stokes?
'ANSWER: It was Mr. Lecce in that board room said—I didn't say he wouldn't approve him. What I said, for the sake of harmony, he would much rather not have Alex Stokes there.
'QUESTION: That was Mr. Lecce?
'ANSWER: Yes.'
Now, does that refresh your recollection?
A That would be probably a correct statement.
Q So that it was Mr. Lecce?
A It had to be."

him that Stokes' name had been submitted to the Commission and then withdrawn, a fact of which another Commissioner, Thomas Livingston, had not been informed.

In rebuttal to Lecce's testimony, John Finley, President of Eagle Downs Racing Association, and Baker's superior, testified that he had wanted to hire Stokes as a placing judge for the meet beginning at Liberty Bell in May 1972. He also testified that he told Baker "that l wanted Alex Stokes and I wanted to push hard for him. I didn't see any reason why we shouldn't have him," (N. T. 329), but later, following another conversation with Baker, Finley directed Baker to withdraw Stokes' name. (N.T. 327–28). He did so reluctantly because he still wanted Stokes to work that meet as a placing judge.

Finley also testified that sometime within a year after Stokes' name was withdrawn, he had a run-in with Lecce at which time he accused the Commissioner of having "denied Stokes to us." (N.T. 334). Lecce responded that Stokes had not done his job according to the rules of racing, "and if he gave them any problems, they were going to throw all of these charges at him." (N.T. 335).

On cross-examination, Finley admitted that he and Lecce were wrangling over the building of a new track in Neshaminy Park (N.T. 338), and that he and Lecce had disagreed over many things.

In my view, the foregoing testimony furnishes ample basis for the jury to have concluded that Lecce "persuaded" Baker to withdraw Stokes' name from the Association's list. Baker testified that Lecce intimated to him that in the interests of harmony, it would be better if he replaced Stokes with another official. Lecce might only have been referring to harmony at the track, but the jury could regard the statement made to Baker, representative of two Associations subject to supervision by the Commission, as a veiled threat concerning the course of future relations between the Associations and the Commission. After a conversation with Baker, Finley agreed that Stokes' name had to be removed from the list. He later confronted Lecce and accused him of "denying" Stokes to the Associations and Lecce didn't deny the charge. The jury could reasonably have concluded that Baker had informed Finley of Lecce's opposition to Stokes, and that Finley had concluded that there was too much risk in putting up a fight to retain Stokes. McDevitt's testimony supplied a motive which the jury could have found convincing. The Commission, after Lecce became Chairman, had appointed a new steward, Robertson, who, like Lecce, had no prior racing experience. Lecce did not want Stokes, a former steward, second guessing and "looking over the shoulder" of the new appointee.

The jury might well have questioned Lecce's testimony as to his feelings about Stokes and his qualifications. Lecce testified that he felt Stokes was qualified to be a placing judge, an opinion with which all the other witnesses were in agreement. On the other hand, Finley testified that when he accused Lecce of "denying" Stokes to the Associations, Lecce said that Stokes had not performed his job as a steward in accordance with the rules of racing. If the jurors believed Finley, they could draw inferences from the exchange which were unfavorable to Lecce. On the one hand, they could infer that Lecce actually felt that Stokes was not qualified, but that he didn't want to run the risk that Stokes would be found qualified after a hearing. On the other hand, the jury could draw an even more likely and more damaging inference: that Lecce knew Stokes was qualified, and made up the charges about poor performance in an attempt to justify blocking Stokes' appointment. At the very least, if the jurors accepted Finley's testimony, the jury could regard Lecce's response to the accusation as an admission that he had "denied" Stokes to Finley's Association.

Additionally, the jury had before it the testimony concerning Lecce's "ex-

manager" statement. After conceding that he might have made the remark to McDevitt, and after defending it as being just common sense, Lecce then testified that he "didn't care" if Stokes became a placing judge. The jury might well have disbelieved this expression of lack of concern. Although defense counsel argued to the jury that the Florida conversation between Lecce and Baranello referred only to the fact that Stokes would not be back *as a steward,* the jury was free to conclude that Lecce intended the "ex-manager" simile to apply whether Stokes "sat on the bench" as a management steward or as a placing judge.

There is further support for the jury's conclusion. The evidence revealed, and Baker was certainly aware, that qualified officials whose names had been submitted by the various associations had been routinely approved, yet he made inquiries about whether Stokes would be approved. He apparently had no doubt about approval for everyone else on his list. Baker's concern, as attested to by Le-John, could well have corroborated for the jury that Baker, as his testimony indicated, had been informed by someone in power that Stokes' name ought to be removed. Significantly too, LeJohn, who worked closely with Lecce, gave Baker no assurance that Stokes would be approved.

In sum, although there is very little direct evidence in the record, there is ample circumstantial evidence to support the jury's verdict that Lecce used the power of his office to deprive Stokes of employment by the Associations as a placing judge. Defendant's motion for new trial on the ground that the verdict is against the weight of the evidence will accordingly be denied.

■ Defendant also contends that a new trial should be ordered because the jury's verdict on damages is excessive. It is within the power of the court to set aside a verdict and grant a new trial if damages awarded are such as to shock the court's conscience. The award of damages here was well within supportable limits.

■ There is clear evidence that plaintiff lost approximately $7,000 in wages for the 1972 racing season. Defendant's main contention concerns the approximately $3,000 which the jury awarded for damage to Stokes' reputation. He argues that the evidence compels the conclusion that Stokes suffered no damage to reputation. Those witnesses who testified to Stokes' prior excellent reputation in the racing community made it clear they still held him in highest regard. More significant from the defendant's standpoint, although Stokes didn't work as a racing official in 1972, he was hired as a steward by the Ontario Jockey Club in March 1973 and was paid at the rate of $150 a day. Shortly thereafter, he accepted a position at Delaware Park for the summer of 1973, leaving Ontario for a job closer to home. At the time of trial, although he was not working, Stokes "had several opportunities to work within the next month" when the racing season started. A man with a damaged reputation in the racing community, defendant argues, would not have had the choice of jobs Stokes had.

Charging the jury on the subject of reputation damage, I conveyed my doubt that Stokes had suffered any compensable damage of this sort. (N.T. 415). Nevertheless, there was testimony on which the jury could have found that questions were being raised as to Stokes' sobriety, integrity, etc., by reason of his failure to be approved as a placing judge. It is not my function to substitute my judgment for that of the jury. Certainly the amount awarded does not, under the circumstances, shock my conscience. *Cf.* Mainelli v. Haberstroh, 237 F.Supp. 190 (M.D.Pa. 1964), aff'd, 344 F.2d 965 (3d Cir. 1965); Peterson v. Calmar S. S. Corp., 296 F.Supp. 8 (E.D.Pa.1969).

(b) *Judgment N.O.V.*

The second aspect of defendant's motion is that even if his involvement

was adequately proven, his intervention and the resulting loss by Stokes of the job as placing judge does not constitute a violation of the Civil Rights Act and requires grant of a judgment n. o. v.

Stokes' cause of action against Lecce is based on 42 U.S.C. § 1983,[5] the Civil Rights Act of 1871. Section 1983 prescribes two elements as requisites for recovery: (1) the conduct complained of must have been by some person acting under color of law; and (2) such conduct must have subjected the complainant to some deprivation of rights secured to him by the Constitution and laws of the United States. Basista v. Weir, 340 F.2d 74, 79 (3d Cir. 1965).

■ Lecce's influence on Baker to remove Stokes' name was quite plainly conduct under color of law. Lecce was Chairman of the State Horse Racing Commission. Anything he said to Baker about Stokes, and any intimations he made about whether the Association's list of officials would be approved were directly related to his official capacity. His ability to influence Baker, General Manager of the Associations, stems precisely from the fact that he was Chairman of the State Racing Commission, and not a private individual. But defendant contends that his conduct did not deprive Stokes of a constitutional right, consequently the other prerequisites of a § 1983 action is missing. Defendant says the only relevant constitutional right seems to be the Fourteenth Amendment—"no *state* shall deprive any person of life, liberty or property without due process of law." Defendant contends that Stokes had no property right in employment as a placing judge—at least not before his name was actually before the Commission for approval following a submission by a private association.

"Thus, since it is only appointment and submission by the private Association which creates the claim of entitlement to employment and gives rise to a Constitutionally protected property right, any right to due process is conditional on such appointment and submission." Citing Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (Brief, p. 9)

It is defendant's position that if Stokes' name was withdrawn by the private association before it was acted upon by the Commission, that was purely private action against which the Constitution affords no protection.

■ Unquestionably if this case involved only a voluntary withdrawal of Stokes' name by a Racing Association, i. e., a revocation of an offer of a job, even if the offer had been accepted by Stokes, there is no constitutional deprivation by such private action. But that is *not* what is involved in this case. Plaintiff contends, and his evidence supports the contention that Lecce, the Chairman of the State Racing Commission, caused his name to be withdrawn by the private association, and effectively deprived him of the property right to the job which had been offered to him and which he had accepted. Defendant appears to concede that if plaintiff's name had been formally submitted by the Association to the Commission for approval, and if the defendant as Chairman of the Commission had ordered the Executive Secretary to remove the name from the list, thereby preventing action by the full Commission, such conduct would violate plaintiff's property right in the employment as placing judge. Proceeding from that, it appears equally clear to me that defendant must concede[6] that if the evidence had dis-

---

5. "§ 1983. Civil action for deprivation of rights.

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privi-

leges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

6. At oral argument counsel for defendant refused to so concede.

closed that he had made an open threat to use the power of his office to harass the Association unless it withdrew plaintiff's name, he would equally effectively have caused the removal of plaintiff's name. Here there was no flagrant open threat, but there was, as discussed above, sufficient evidence upon which the jury could conclude that by veiled threat, "for the sake of harmony," Lecce had used the power of his office to cause the Association to remove plaintiff's name, that he had used the power of his office to terminate an employer-employee relationship which had already been established between plaintiff and the Association, notwithstanding that the time for performance was not to commence until sometime in the future. "This informal, behind the scenes exertion of state authority is as much within the scope of § 1983 as the more usual examples of formal and open action leading to the denial of federal rights." Kletscha v. Driver, 411 F.2d 436, 447 (2d Cir. 1969).

From several of the questions asked during the trial, and from defendant's reliance on the *Roth* decision, there appears to be some confusion as to the nature of the property right involved here. This is *not* a case in which plaintiff is claiming entitlement to be reappointed to a job *by the Commission,* a situation more nearly analogous to *Roth.* In this case plaintiff claims a property right in the purely private employment relationship entered into between the Association and him. True enough, his appointment was subject to approval by the Commission, but as I interpret 15 P.S. § 2660, and as I instructed the jury, the Commission's role is limited to determining whether the officials appointed by the Association are qualified. Compensation of judges and starters is fixed by the Commission, but they are paid by the Associations. They are not state employees. The legislature apparently limited the Commission's role to insuring that officials were qualified, without burdening the Commission with the responsibility for the actual selection and hiring. The testimony reveals that the Commission has operated in conformity with that view of the statute. Qualified officials whose names have been submitted by the Racing Associations have been automatically approved. (N.T. 126–27; 283).

■ It would not be accurate to state that Stokes had a constitutionally protected interest in the *job* as placing judge. As between Stokes and the Racing Associations, the latter could have changed its mind and withdrawn the appointment, or it might have terminated the employment at anytime, at the most risking a breach of contract claim. The constitutionally protected right which Stokes did have was to be free from the exertion of the power of a state official's office to interfere with employer-employee relationship. It was left for the jury to determine how long that relationship between the Associations and Stokes would have continued but for the interference by Lecce. By its verdict, the jury determined that the relationship would have lasted for the entire year during which Stokes was unable to obtain other employment as a racing official.

■ It should be noted that the evidence supports a finding of deprivation of rights by Lecce under color of state law in either of two ways. First, by the threat (albeit veiled) of some state sanctioned reprisal against the Associations if Stokes' name was not withdrawn, and second, by denying Stokes due process in the withholding of Commission approval of his appointment as a placing judge. At trial and in his brief on the post trial motion, Lecce has gone to great pains to point out that Stokes had not been disapproved since his name was never actually before the Commission. In my view, the fact that Stokes' name was not formally before the Commission is not dispositive of the due process issue. If Lecce, by his conduct, deliberately circumvented regular procedure and prevented Stokes' name from reaching the Commission,

he just as effectively deprived Stokes of due process as if the name had been submitted and had been disapproved arbitarily and summarily.

As Justice Frankfurter wrote, "Fairness of procedure is 'due process in the primary sense.' It is ingrained in our national traditions and is designed to maintain them. Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 161, 71 S.Ct. 624, 643, 95 L.Ed. 817 (concurring opinion) (citation omitted). Procedural regularity, as defined by law, regulations, and custom, is our basic safeguard against arbitrary and capricious abuse of official power. The due process clause prohibits government officials from jettisoning regular procedures whenever they perceive their objectives to be of overiding importance. Lecce may have borne Stokes no personal animosity and may have sincerely believed that a house cleaning was in order and that Liberty Bell would operate more smoothly without Stokes. But if he wanted to block Stokes' appointment, in the absence of a legislative alteration of § 2660, he was obligated to do so by allowing the matter of Stokes' qualifications to be resolved through fair procedures before the Commission. The due process clause brooks no other means of achieving the Commissioner's ends.

The alternative motion for judgment n. o. v. will be denied.

2. *Plaintiff's Motion for Assessment of Attorney's Fee*

In Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), a case arising under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 412, Justice Brennan discussed at some length the principles governing the propriety of the award of attorney's fees to a successful plaintiff. The following quotation of portions of that discussion (footnotes and citations are omitted) capsulizes the applicable principles:

"Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. Indeed, the power to award such fees 'is part of the original authority of the chancellor to do equity in a particular situation,' . . . and federal courts do not hesitate to exercise this inherent equitable power whenever 'overriding considerations indicate the need for such a recovery.' . . .

"Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' . . . In this class of cases, the underlying rationale of 'fee-shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant.

"Another established exception involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.' . . . 'Fee-shifting' is justified in these cases, not because of any 'bad faith' of the defendant but, rather, because '[t]o allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.' . . ." Hall v. Cole, 412 U.S. 1, 4–6, 93 S.Ct. 1943, 1947, 36 L.Ed.2d 702.

There is no express provision governing the allowance of attorneys' fees in suits brought under 42 U.S.C. § 1983. The Supreme Court, in a footnote to its Per Curiam opinion in Northcross v. Memphis Board of Education, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973)

(a suit dealing with attorneys' fees under the Emergency School Aid Act of 1972, 20 U.S.C. § 1617), noted: "We also do not decide whether, and under what circumstances, an award of attorneys' fees is permissible in suits brought under 42 U.S.C. § 1983 in the absence of specific statutory authorization for such an award. See Knight v. Auciello, 453 F.2d 852 (C.A.1, 1972); Lee v. Southern Home Sites Corp., 444 F.2d 143 (C.A.5, 1971)." *Id.* 429, n. 2, 93 S.Ct. 2202.

In Skehan v. Bd. of Trustees of Bloomsburg State Col., 501 F.2d 31 (3d Cir. 1974), there is the statement: "Withholding an award of attorneys' fees in a case where a constitutional violation has been established removes a substantial incentive toward efforts looking to vindicate Constitutional rights." (*Id.* 44) Further discussion

by the court intimated that disallowance of fees in such a case must be supported by good reasons. The cases cited in *Skehan* (and additional cases which we have found in which award or denial of fees was considered properly within the Court's discretion) dealt with situations in which equitable relief was granted, and in addition, extraordinary circumstances were present involving either (1) obdurate and obstinate conduct on the part of the defendants;[7] or (2) plaintiff's efforts were extraordinary, resulting in a substantial benefit to large classes of persons;[8] or (3) where the rights vindicated were important, but were of relatively low economic value from a damage standpoint;[9] or (4) the cases were brought under statutes specifically authorizing the award of such fees,[10] or combinations of the above.[11]

7. Gates v. Collier, 489 F.2d 298 (5th Cir. 1973) (Prison rights, fee grant affirmed); Rainey v. Jackson State College, 481 F.2d 347 (5th Cir. 1973) (First Amendment violation of teacher's rights, remand for determination of proper fee); Jinks v. Mays, 464 F.2d 1223 (5th Cir. 1972) (Equal protection, remand for hearing on fee, no intimation as to result); Monroe v. Bd. of Commissioners of City of Jackson, Tenn., 453 F.2d 259 (6th Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2045, 32 L.Ed.2d 333 (1972) (Desegregation, fee grant affirmed); Horton v. Lawrence County Bd. of Education, 449 F.2d 793 (5th Cir. 1971) (Desegregation, remand for hearing on fee, no intimation as to result); Lee v. Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970) (Racial discrimination, remand for hearing on fee); Williams v. Kimbrough, 415 F.2d 874 (5th Cir. 1969), aff'g 295 F.Supp. 578, cert. denied, 396 U.S. 1061, 90 S.Ct. 753, 24 L.Ed.2d 755 (1970) (Racial discrimination, fee denied); Kemp v. Beasley, 352 F.2d 14 (8th Cir. 1965) (Desegregation, fee denied); Bradley v. School Board of City of Richmond, Virginia, 345 F.2d 310 (4th Cir. 1965) (Desegregation, fee denied); Bell v. School Board of Powhatan County, Virginia, 321 F.2d 494 (4th Cir. 1963) (Desegregation, fee granted).

8. Brewer v. Sch. Bd. of City of Norfolk, Vir., 456 F.2d 943 (4th Cir.), cert. denied, 406 U.S. 903, 92 S.Ct. 1778, 32 L.Ed.2d 136 (1972) (Desegregation, fee granted); Palmer v. Columbia Gas of Ohio, Inc., 375 F.Supp. 634 (N.D.Ohio 1974) (Due process, fee granted); Prostrollo v. University of South Da-

kota, 369 F.Supp. 778 (D.S.D.1974) (Equal protection, fee denied); Baltic Ind. Sch. District v. South Dakota H. School Act. Assn., 362 F.Supp. 780 (D.S.D.1973) (Equal protection, fee denied); Jinks v. Mays, 350 F. Supp. 1037 (N.D.Ga.1972) (on remand) (Equal protection, fee granted).

9. Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972), reh. and reh. en banc denied October 5, 1972, and 493 F.2d 765 (5th Cir. 1974), reh. and reh. en banc denied June 6, 1974. (Racial discrimination, fee grant affirmed); Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972) (Racial discrimination, fee granted, remand for determination of proper fee); Lee v. Southern Home Sites Corp., 444 F.2d 143 (5th Cir. 1971) (Racial discrimination, fee granted, remand for determination of proper fee); Yelverton v. Driggers, 370 F.Supp. 612 (M.D.Ala.1974) (Reapportionment, fee granted); Stanford Daily v. Zurcher, 366 F.Supp. 18 (N.D.Calif.1973) (Fourth Amendment search, fee granted).

10. Northcross v. Memphis Board of Education, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (Per Curiam) (§ 718 of Emergency School Aid Act of 1972, 20 U.S.C. § 1617, remand for determination of proper fee); Newman v. Piggie Park Enterprises Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (Per Curiam) (Racial discrimination, fee granted under Title II of Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(a)); Thompson v. Madison County Bd. of Education, 496 F.2d 682 (5th Cir. 1974) (Racial discrimi-

The instant case concerns Stokes alone. The outcome of this suit affects no discernable class of persons. It is essentially a suit to protect Stokes' property rights, a suit for personal damages. The jury awarded substantial compensatory damages to Stokes for loss of earnings and for damage to his reputation. True enough, Stokes asked for equitable relief in his complaint[12] but none was deemed appropriate or necessary after trial. Further, there is no such "obdurate" or "obstinate" conduct on Lecce's part as to warrant "fee shifting" on punitive grounds. Lecce's actions resulted from his mistaken and misguided belief as to the means he could lawfully use to accomplish what he undoubtedly perceived to be good ends for the Racing Commission. His defense of his conduct in this lawsuit cannot be characterized as a bad faith defense of a hopeless position; indeed, the question of his having violated Stokes' civil rights is a close one, one on which Lecce might yet prevail.

Since this suit is essentially one for damages, and the outcome confers no general benefit on any large class of persons, there is no reason to depart from the general rule, which is to disallow counsel fees to the successful plaintiff. I am in agreement with the statement by Chief Judge Lumbard of the Court of Appeals for the Second Circuit, sitting by designation in the District Court for the District of Connecti-

---

nation, fee granted under § 718 of Emergency School Aid Act of 1972, 20 U.S.C. § 1617, remand for determination of proper fee); Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) (Racial discrimination, fee under § 706(k) of Title VI of Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k) held inadequate, remand for redetermination of proper fee).

11. Stolberg v. Members of the Bd. of Trustees for the State Colleges of Conn., 474 F.2d 485 (2d Cir. 1973) (First Amendment, fee granted alternative holding under categories (1) and (2)); Fairley v. Patterson, 493 F.2d 598 (5th Cir. 1974) (Reapportionment, fee granted, alternative holding under categories (1) and (3)); Donahue v. Staunton, 471 F.2d 475 (7th Cir. 1972), reh. en banc denied September 15, 1972, cert. denied 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973) (First Amendment, fee granted, alternative holding under categories (1) and (3)); NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.), aff'd 493 F.2d 614 (5th Cir. 1974) (Racial Discrimination, fee granted, alternative holding under categories (1) and (3)); Brandenburger v. Thompson, 494 F.2d 885 (9th Cir. 1974) (Residency requirement for Welfare benefits, fee granted, holding justified under categories (2) and (3)); Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D.Md.1973), modified as to City Council, not as to attorneys' fees in 486 F.2d 1134 (4th Cir. 1973) (Racial discrimination, fee granted, holding justified under categories (2) and (3)); Wyatt v. Stickney, 344 F.Supp. 387 (M.D.Ala.1972) (Mental Hospital, denial of treatment for inmates, fee granted, holding justified under categories (2) and (3)); Sims v. Amos, 340 F.Supp. 691 (M.D.Ala.

1972), aff'd mem. Amos v. Sims, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972) (Reapportionment, fee granted, holding justified under categories (2) and (3)).

12. Paragraphs 16–19 of the complaint are reprinted:

"16. A declaration of his rights as a citizen of the United States and the State of Pennsylvania to have his appointment by the officials of the Continental Thoroughbred Racing Association—Eagle Downs Racing Association considered on its merits by all the members of the Pennsylvania State Horse Racing Commission.

"17. A declaration of his rights as a citizen of the United States and the State of Pennsylvania to know the reasons for the denial of his appointment and to present his qualifications for the appointment at a hearing conducted by the Pennsylvania State Horse Racing Commission.

"18. A declaration that the actions of the Defendant in failing to allow Plaintiff's aplication to be considered by all the members of the Pennsylvania State Horse Racing Commission, in failing to give reasons for the denial of his appointment, and by failing to grant Plaintiff an opportunity to present his qualifications before the full Commission constitute arbitrary, capricious, and unreasonable conduct under color of state law and in contravention of the due process, equal protection, and rights, privileges and immunities clauses of the Fourteenth Amendment of the Constitution of the United States.

"19. That Defendant Joseph L. Lecce be enjoined and ordered to submit Plaintiff's appointment to the entire membership of the Pennsylvania State Horse Racing Commission for their consideration of its merits."

cut, in response to a request for counsel fees after he had awarded damages to plaintiff for a beating suffered at the hands of the police:

" . . . the court is not disposed to award counsel fees in a case which is essentially a simple tort action arising from an incident affecting but one person." Arroyo v. Walsh, 317 F. Supp. 869, 873 (D.Conn.1970).

See also Jacobs v. City of New Orleans, 484 F.2d 24 (5th Cir. 1973), where denial of an award of counsel fees was affirmed in a police beating case in which defendants' acts were not done with "such malice as implies a spirit of mischief or criminal indifference to civil obligations." (Quoting the District Court's finding.) *Id.* at 26.

The motion for award of attorney's fees will be denied.