**ILLINOIS CITIZENS COMMITTEE FOR BROADCASTING et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 73–1652.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 7, 1974.

Decided Nov. 20, 1974.

As Supplemented on Denial of Rehearing and Rehearing En Banc March 13, 1975.

As Amended April 21, 1975.

---

**93.** See Parts III, IV, *supra.*

**94.** See Part III, *supra.*

**95.** See note 7, *supra.*

**96.** See Parts III, IV, *supra.*

**97.** See cases cited *supra* note 41.

**98.** See note 7, *supra.*

Thomas R. Asher, Washington, D. C., with whom Kenneth N. Flaxman, Chicago, Ill., was on the brief, for petitioners.

Joseph A. Marino, Associate Gen. Counsel, with whom John W. Pettit, Gen. Counsel at the time the brief was filed, and R. Michael Senkowski, Counsel, were on the brief for respondent, Federal Communications Commission.

Carl D. Lawson, Atty. Dept. of Justice, filed a brief for respondent, United States of America.

Howard E. Shapiro, Washington, D. C., entered an appearance for respondent, United States of America.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This controversy arises from the response of the Federal Communications Commission to certain radio call-in programs on sex-related topics. On March 27, 1973, the FCC announced an inquiry into the broadcast of obscene, indecent, or profane material. On the following day, FFC Chairman Dean Burch, in a speech before the National Association of Broadcasters, urged licensees to exercise self-restraint. A Notice of Apparent Liability proposing a forfeiture of $2,000 against one licensee was issued on April 11. The forfeiture was paid by the licensee, but Petitioners, Illinois Citizens Committee for Broadcasting and the Illinois Division of the American Civil Liberties Union, filed an Application for Remission of the Forfeiture and a Petition for Reconsideration as representatives of the listening public. The Commission, in a Memorandum Opinion and Order, refused to grant the relief requested by Petitioners but discussed at some length its purpose in instituting the Inquiry and in assessing the forfeiture. We affirm the Commission's action.

## I. STATEMENT OF FACTS

In response to increasing complaints from listeners, the Commission, in January of 1973, asked its staff to tape certain radio call-in programs that focused on sexual topics. The staff taped 61 hours of programs, 22 minutes of which were culled for presentation to the Commissioners on March 21. The Commissioners also heard an 11-minute segment that included an on-the-air complaint from a listener.

On March 27,[1] the Commission released a Notice of "Inquiry into alleged broadcasts and cablecasts of obscene, indecent or profane material by licensees, permittees or cable systems." The inquiry was to be a nonpublic fact-finding proceeding to determine whether certain television, cable, and radio licensees had broadcast material in violation of 18 U.S. C. § 1464 (1970).[2]

On the day of the release, the National Association of Broadcasters, at its annual convention, adopted a resolution condemning sexually oriented radio call-in shows. In his address to the Association on the following day Chairman Burch approved that step and urged the broadcasters to exercise self-restraint in order to avoid intrusions by the Commission, the Congress, and the courts.

After listening to the taped excerpts on March 21, 1973, the FCC instructed its staff to prepare a Notice of Apparent Liability under sections 503(b)(1)(E) and 503(b)(2) of the Communications Act of 1934, as amended,[3] against Son-

---

1. In its Memorandum Opinion and Order of July 6, 1973, the FCC says, "Although initiation of the Inquiry followed the playing of the tape, the tape was not the basis for that action. The Commission had been made well aware of the mounting concern about allegedly obscene programming, and the Inquiry Notice would have issued even if the tape had not been compiled and played."

2. 18 U.S.C. § 1464 (1970) provides:
   Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both.

3. These provisions, codified in 47 U.S.C. § 503 (1970), set forth that—
   (b) (1) Any licensee or permittee of a broadcast station who—

\* \* \* \* \*

   (E) violates section . . . 1464 of Title 18, shall forfeit to the United States a sum not to exceed $1,000. Each day during which such violation occurs shall constitute a separate offense. Such forfeiture shall be in addition to any other penalty provided by this chapter.
   (2) No forfeiture liability under paragraph (1) of this subsection (b) shall attach unless a written notice of apparent liability shall have been issued by the Commission and such notice has been received by the licensee or permittee or the Commission shall have sent such notice by registered or certified mail to the last known address of the licensee or permittee. A licensee or permittee so notified shall be granted an opportunity to show in writing, within such reasonable period as the Commission shall

derling Broadcasting Corporation (Sonderling) for violations of § 1464. The Notice specifically cited Sonderling's "Femme Forum," a call-in show that ran Monday through Friday, from 10 a. m. to 3 p. m. on WGLD-FM, Oak Park, Illinois. The Commission focused on two programs that had been excerpted in the tapes—one, on February 23, 1973, was on the topic of oral sex; [4] the other, on February 21, 1973, discussed "How do you keep your sex life alive?" and included specific descriptions of the techniques of oral sex.[5] The Notice "concluded" that these broadcasts called for the imposition of a forfeiture of $2,000 against Sonderling because they contained "obscene or indecent matter." It also informed Sonderling of a licensee's statutory right to refuse to pay the forfeiture voluntarily and thus to require the FCC to seek to recover it in a trial *de novo* before a court.[6] Despite its belief that the Commission's action was illegal, Sonderling decided to pay the fine because of "the tremendous financial burden involved." [7]

Asserting that the public had an interest in seeking review of the FCC action despite Sonderling's acquiescence, Petitioners filed an Application for Remission of Forfeiture and a Petition for Reconsideration.[8] They allege that their members and contributors include many numbers of the Chicago area who are being deprived of listening alternatives in violation of their rights under the First Amendment. On July 6, the Commission released the Memorandum Opinion and Order now under review. Although it expressed doubts as to Petitioners' standing to seek remission or reconsideration of the forfeiture,[9] the FCC agreed to clarify its intentions in order to rectify misunderstandings regarding the Notice of Inquiry and the Notice of Apparent Liability. The Commission did not discuss the Chairman's

---

by regulations prescribe, why he should not be held liable. A notice issued under this paragraph shall not be valid unless it sets forth the date, facts, and nature of the act or omission with which the licensee or permittee is charged and specifically identifies the particular provision or provisions of the law, rule, or regulation or the license, permit, or cease and desist order involved.

4. One exchange cited by the FCC from this program is as follows:

Female Listener: . . . of course I had a few hangups at first about—in regard to this, but you know what we did—I have a craving for peanut butter all that [sic] time so I used to spread this on my husband's privates and after a while, I mean, I didn't even need the peanut butter anymore.

Announcer: (Laughs) Peanut butter, huh?

Listener: Right. Oh, we can try anything—you know—any, any of these women that have called and they have, you know, hangups about this, I mean they should try their favorite—you know like—uh.

. . .

Announcer: Whipped cream, marshmallow, . .

(J.A. 31–32). Other segments concerned aversions to swallowing the semen at climax, overcoming fears as to having the penis bitten off, and so forth. (J.A. 32).

5. J.A. 32–33.

6. Section 504(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 504(a) (1970).

7. Letter of May 3, 1973, from Egmont Sonderling, Sonderling Broadcasting Co., to FCC (J.A. 61).

8. Petitioners requested the Commission to "(1) remit in its entirety the forfeiture of $2,000 assessed against Sonderling Broadcasting Corporation . . . in the Commission's April 11, 1973 Notice of Apparent Liability; (2) withdraw the Notice; (3) terminate, *nunc pro tunc*, the 'Inquiry into alleged broadcasts and cablecasts of obscene, indecent or profane material,' . . . (4) retract and disavow the public remarks of Chairman Dean Burch regarding the Commission's intentions and policies concerning alleged obscene and indecent programming, including his March 28, 1973 speech to the National Association of Broadcasters; and (5) acknowledge ICCB's right to intervene and participate in these proceedings." Application for Remission of Forfeiture and Petition for Reconsideration (J.A. 63–64) (footnotes omitted).

9. Memorandum Opinion and Order (J.A. 102).

speech, stating that it was not a Commission action.[10]

## II. JURISDICTION

■ 28 U.S.C. § 2342(1) (1970) provides for review in the courts of appeals of "all final orders" of the FCC. This Court has said that "to be final an order must 'impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process.' " Bethesda-Chevy Chase Broadcasters, Inc. v. FCC, 128 U.S.App.D.C. 185, 186, 385 F.2d 967, 968 (1967), *quoting* Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corporation, 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948). The FCC's Memorandum Opinion and Order is a final order within the meaning of that statute. It refuses to withdraw the Notice of Inquiry and Notice of Apparent Liability, thereby "denying the rights" asserted by Petitioners under the First Amendment and 47 U.S.C. § 326 (1970).

■ The speech by Chairman Burch, however, is not a "final order" of the FCC. Indeed, it is not FCC action at all, but merely represents the unofficial expression of the views of one member of the Commission. It is not a decisional pronouncement affecting legal rights and obligations in the manner contemplated by this court in *Bethesda-Chevy Chase Broadcasters*. It is not "agency action" for purposes of the Administrative Procedure Act, 5 U.S.C. § 702 (1970).

## III. STANDING

The United States urges that the public, as distinguished from the licensee, has no interest in a forfeiture proceeding. The Supreme Court, in Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), stressed that the public has no absolute right to dictate the content of broadcast material. That case, however, involved a conflict between the broadcaster's right to refuse to broadcast certain material and the public's right of access to air time. The Court reaffirmed " 'the right to the public to be informed,' " as distinguished from " 'any right on the part of . . . any individual member of the public to broadcast his own particular views on any matter.' " 412 U.S. at 112–113, 93 S.Ct. at 2091, *quoting* Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1249 (1949). In this case, the representatives of the public allege that the right of the public to be informed has been curtailed by limitations imposed by the government, invalidly, on the broadcaster's discretion to present material.

■ We uphold Petitioners' standing to vindicate the public's interest. That interest is underscored by the likelihood that the licensee who is directly governed by the order in the forfeiture proceeding will, as here, find the burden too great, in terms of its own interest, to warrant its undertaking the risk and expense involved in contesting the Commission's action.[11] In comparable situations we have allowed interested parties to intervene where the party that would ordinarily be expected to press the public interest has failed to appeal an initial decision. *E. g.,* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969); Wolpe v. Poretsky, 79 U.S.App.D.C. 141, 144 F.2d 505, cert. denied, 323 U.S. 777, 65 S.Ct. 190, 89 L.Ed. 621 (1944).

---

10. J.A. 100 n. 7.

11. . . . . [A]ssuming our hypothetical figures, the alleged offender must risk a thousand dollars in order to try to save a hundred dollars. Such a risk is seldom an attractive one, especially when other factors also discourage judicial review, including the expense of defending the prosecution, the distaste for being prosecuted criminally, inconvenience, uncertainty, and delay. Whatever the statute may say about judicial review, therefore, the practical fact is that judicial review is usually unavailable.
1 K. Davis, Administrative Law Treatise § 4.05, at 253 (1958).

## IV. PROCEDURAL ASPECTS OF THE FCC'S ISSUANCE OF THE NOTICE OF APPARENT LIABILITY

The procedure used by the FCC in issuing the Notice of Apparent Liability raises questions with regard to the rights of the licensee. First, it includes terms of conclusions, while the statute contemplates only charges.[12] If construed as the latter, then Sonderling was not provided with notice or opportunity for a hearing before its issuance, even though it seemed to go far towards the imposition of a substantial fine. This procedure seems very like that condemned by the Supreme Court in Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). There the Court reviewed the practices of a state commission that sent distributors of publications that had been found objectionable for sale to minors notification of that finding, accompanied by reminders of possible criminal sanctions if the distributor failed to "cooperate." The system was found to constitute an informal "scheme of . . . censorship," 372 U.S. at 72, 83 S.Ct. 631, based on "radically deficient" procedures. 372 U.S. at 71, 83 S.Ct. 631. The Court stressed:

> There is no provision whatever for judicial superintendence before notices issue or even for judicial review of the Commission's determinations of objectionableness. The publisher or distributor is not even entitled to notice and hearing before his publications are listed by the Commission as objectionable.

372 U.S. at 71, 83 S.Ct. at 640.

It is true that the licensee here does have an opportunity for judicial review,

if it is willing to shoulder the expense. However, the Court's "insistence [in Bantam Books] that regulations of obscenity scrupulously embody the most rigorous procedural safeguards," 372 U.S. at 66, 83 S.Ct. at 637, and its requirement of notice and hearing before a determination of obscenity is made, cast doubt on the procedures used by the Commission.

■■ However, we do not think that the procedural safeguards prescribed in Bantam Books, which were found to be essential for the protection of "[t]he publisher or the distributor," 372 U.S. at 71, 83 S.Ct. 631, can be asserted by the public as procedural error. The statute contemplates that the licensee will, in the first instance, ensure that First Amendment limitations are not overstepped in forfeiture action under § 503(b)(1)(E). We have no need to consider whether the public is entitled to intervene on a petition for reconsideration after the initial determination has been made when the licensee declines to press the matter further. Cf. Smuck v. Hobson, supra; Nuesse v. Camp, 128 U.S.App. D.C. 172, 182 n. 10, 385 F.2d 694, 704 n. 10 (1967); Wolpe v. Poretsky, supra. In this case a representative of the public did in fact ask the Commission to reconsider its determination, and the Commission responded in some detail to the concerns expressed. Finding no prejudice from the procedure,[13] we turn to the merits.

## V. THE FCC's DETERMINATION THAT THE BROADCAST IS OBSCENE [14]

In its Memorandum Order and Opinion the Commission asserted that

---

12. 47 U.S.C. § 503(b)(2) (1970) calls for a "written notice of apparent liability" (emphasis added) that contains specific information as to the act or omission with which the licensee is "charged" before forfeiture liability can be imposed. See note 3 supra.

13. The Petitioners contend that the language of § 503(b)(1)(E), which authorizes the Commission to impose a forfeiture on any licensee

who "violates section . . . 1464 of Title 18," contemplates that the FCC may act only after the licensee has been convicted under § 1464 in a criminal proceeding. That issue involves the rights of the licensee, rather than the rights of the public, and is appropriately raised only by the licensee.

14. The FCC also found that the broadcast material violated § 1464 in that it was "in-

Sonderling's broadcast was a clear-cut violation of the law, "well within the constitutional boundaries [for obscenity] established by the Supreme Court," and therefore not entitled to protection under the First Amendment. (J.A. 104, 106)

■ The excerpts cited by the Commission contain repeated and explicit descriptions of the techniques of oral sex. And these are presented, not for educational and scientific purposes, but in a context that was fairly described by the FCC as "titillating and pandering." (J.A. 38) The principles of Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), are applicable, for commercial exploitation of interests in titillation is the broadcaster's sole end. It is not a material difference that here the tone is set by the continuity provided by the announcer rather than, as in *Ginzburg,* by the presentation of the material in advertising and sale to solicit an audience. We cannot ignore what the Commission took into account— that the announcer's response to a complaint by an offended listener [15] and his presentation of advertising for auto insurance [16] are suffused with leering innuendo. Moreover, and significantly, "Femme Forum" is broadcast from 10 a. m. to 3 p. m. during daytime hours when the radio audience may include children—perhaps home from school for lunch, or because of staggered school hours or illness. Given this combination of factors, we do not think that the FCC's evaluation of this material infringes upon rights protected by the First Amendment.

■ The FCC found Sonderling's broadcasts obscene under the standards of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). The Supreme Court subsequently reformulated those standards in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973),[17] which sets out the following "basic guidelines for the trier of fact":

> (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest . . . (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24, 93 S.Ct. at 2615. In Huffman v. United States, 163 U.S.App. D.C. 417, 502 F.2d 419 (1974), we analyzed how the *Miller* standards deviate from those previously enunciated. *Miller* rejected the *Memoirs* rule that material was condemnable only if "utterly without redeeming social value" and substituted a rule that permits prohibition if the material lacks "serious literary, artistic, political, or scientific value." 413 U.S. at 24–25, 93 S.Ct. at 2615. In this respect, *Miller* expanded the range of material that can be found ob-

decent." "Indecent," as construed by the FCC in its decision in WUHY–FM, 24 FCC 2d 408, 412 (1970), means that the material broadcast is patently offensive by contemporary community standards and is utterly without redeeming social value. Thus, to establish that material is "indecent" it need not be shown to appeal to a prurient interest, although the other requirements of the obscenity standards set forth in Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed. 2d 1 (1966), must be met. Since we find that the FCC's decision can be affirmed solely on the basis of its finding that the broadcast material is "obscene," we need not reach the question of the constitutionality of its interpretation and application of the term "indecent."

15. J.A. 39–41.

16. J.A. 41.

17. The standards of Miller v. California, *supra,* have been applied by the Court to federal prosecutions. *See* United States v. 12 200-ft. Reels of Super 8mm. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

scene. However, it also contracted the definition of obscenity by limiting it to encompass only materials that "depict or describe patently offensive 'hardcore' sexual conduct specifically defined by the regulating state law." 413 U.S. at 27, 93 S.Ct. at 2616. *Accord* Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed. 2d 640 (1974); Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The material broadcast by Sonderling, say Petitioners, is not "utterly without redeeming social value" and thus is not obscene under the *Memoirs* standards applied by the Commission. The licensee may have had a right to less demanding treatment under *Memoirs* had he refused to pay the forfeiture. However, he accepted the fine and waived his right to a jury trial at a time when *Memoirs* prevailed, and that matter should not be reopened now. The public is in a somewhat different position. They seek through this case, to define what they will be entitled to hear in the future. (Reply Br. 26-27) For that purpose, of future entitlement, we think it appropriate to apply the *Miller* standard concerning the purpose of the regulated material, and the *Miller* standard does not rescue the material in these broadcasts, which make no literary, artistic, political, or scientific contribution.[18]

The Commission reasonably concluded that the dominant theme of the material broadcast by Sonderling was addressed to the prurient interest and was therefore condemnable under that element of the *Memoirs* test. (J.A. 38) *Miller*, however, requires that the material depict or describe "in a patently offensive way, sexual conduct specifically defined by the applicable . . . law." 413 U.S. at 24, 93 S.Ct. at 2615. Although

Petitioners filed a reply brief after the Court's decision in *Miller*, they did not challenge the possible lack of the requisite statutory specificity. Rather, they assert that *Miller* retained the first two tests of *Memoirs* and that these tests were misapplied by the Commission. (Reply Br. 14) We see no point in pursuing in the abstract the question whether the finding of obscenity here survives the narrowing of the second test that was accomplished in *Miller*, especially since we have the additional elements of titillation and probable exposure to children, which even some of the dissenting Justices in *Miller* thought sufficient to permit condemnation. Paris Adult Theatre I v. Slaton, 413 U.S. 49, 114, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (Brennan, J., dissenting). Moreover, *Miller's* specificity requirement is designed to "provide fair notice to a dealer," 413 U.S. at 27, 93 S.Ct. at 2616, and it is not clear whether it is a requirement that may be insisted upon by the public when waived by the licensee. Petitioners' goal is to determine what *material* is withdrawn from censorship on grounds of obscenity because of the protections of the First Amendment, and that turns primarily on the nature of the social purpose that may redeem material that otherwise stands condemned. In this respect *Miller* narrows the protection afforded by *Memoirs* in a manner that undercuts the most important feature of Petitioners' claim.

Petitioners put it that an administrative agency like the Commission does not furnish the contemporary community lens which supplied the premise for obscenity determinations contemplated in both *Miller* and *Memoirs*. Here, a jury trial was available [19] but

18. Petitioners claim that the FCC erred in failing to respond to the testimony of experts that the program served important social interests. However, the factfinder in an obscenity determination is "not bound to accept the opinion of any expert in weighing the evidence of obscenity." Hamling v. United States, *supra*, 418 U.S. at 100, 94 S.Ct. at 2899.

Petitioners suggest that the broadcasts aid women in their adjustment to changing social mores. Stretching the definition of obscenity to this extreme is contrary to the Supreme Court's approach. *See* Miller v. California, *supra*, 413 U.S. at 35–36, 93 S.Ct. 2607.

19. An action by the United States to recover a statutory penalty is of a common law na-

was waived by the licensee. A jury determination is not required to vindicate the public interest in those circumstances. The Supreme Court has held the *Miller* standards applicable where defendant waives his right to trial by jury. Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). Indeed, the Court has found no constitutional bar to the application of the *Miller* standards in a state civil proceeding where there is no right to jury trial. Alexander v. Virginia, 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973).

█ Petitioners object that the Commission's determination was based on a brief condensation of offensive material and did not take into account the broadcast as a whole, as would seem to be required by certain elements of both the *Memoirs* and the *Miller* tests. The Commission's approach is not inappropriate in evaluating a broadcasting program that is episodic in nature—a cluster of individual and typically disconnected commentaries, rather than an integrated presentation. It is commonplace for members of the radio audience to listen only to short snatches of a broadcast, and programs like "Femme Forum" are designed to attract such listeners. Moreover, the pervasive pandering approach here makes the broadcast pornographic even though some of its elements may be unoffensive. Ginzburg v. United States, *supra*, 383 U.S. at 471, 86 S.Ct. 942. If the licensee or the public representatives have reason to believe that an assessment of the impact of an offensive segment would be substantially affected by consideration of the program as a whole, they should be given an opportunity to offer such evidence. There was no such proffer in this case.

We conclude that, where a radio call-in show during daytime hours broadcasts explicit discussions of ultimate sexual acts in a titillating context, the Com-

mission does not unconstitutionally infringe upon the public's right to listening alternatives when it determines that the broadcast is obscene.

Affirmed.

## SUPPLEMENT TO OPINION OF NOVEMBER 20, 1974

LEVENTHAL, Circuit Judge:

In seeking rehearing, petitioners, Illinois Citizens Committe for Broadcasting and the American Civil Liberties Union, are essentially concerned that our opinion is insensitive to their role as representatives of the listening public. Their characterization of our opinion suggests a misunderstanding of its import.

█ We do contemplate that representatives of the public have a role in FCC proceedings concerning obscenity determinations—as is indicated by our recognition that they have standing to challenge the substantive grounds of Commission action even where the licensee is willing to pay the forfeiture and thus acquiesces in the Commission's determination. We are cited to no Supreme Court case that goes this far in a situation where the producer or distributor directly affected has acquiesced.* However, we found such a requirement implicit in the contours of the statute, a procedural right that furthers the substantive rights of the public under the First Amendment.

█ Their standing is consequent, since the Commission must pay careful attention to ensure that the freedom of substantial numbers of the listening public is not curtailed because of possible offensiveness to particularly sensitive listeners who retain the option of switching off the offending broadcasts. Whatever the difficulty of determining the relevant community standards in a national context, we believe that the Commission must adopt, in its delibera-

---

ture for purposes of the Sixth Amendment. Connolly v. United States, 149 F.2d 666 (9th Cir. 1945). *See* 5 Moore's Federal Practice ¶ 38.31 [1], at 232–33.

* Even the procedural point in Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), was raised by four publishers.

tions leading to any substantive determination of obscenity, approaches that provide, as nearly as possible, the functional equivalent of a jury determination of a clear community consensus that the material is lewd and offensive. In approaching this sensitive obligation, the Commission does not have the free hand of bureaucratic censorship. We also note that we have not relied upon the second ground of the FCC's determination in this case—its latitude to hold things "indecent" that are not obscene.

In evaluating petitioners' challenges, however, we were persuaded that the Commission has, in this case, made a strong showing that the conduct was' unprotected by the First Amendment and that the rights of the public were not unconstitutionally infringed. Before the proceedings before the Commission were there disposed of, the public interest represented by petitioners had been afforded opportunity to present for consideration all matters petitioners desired to raise, including petitioners' position that that the forfeiture by Sonderling should be remitted.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER OF MARCH 13, 1975

PER CURIAM.

It appearing that petitioners' suggestion for rehearing *en banc* having been transmitted to the full Court and there not being a majority of the Judges in regular active service in favor of having this case reheard *en banc*, it is

Ordered by the Court *en banc* that the aforesaid suggestion for rehearing *en banc* is denied.

1. *See, e. g.,* Yale Broadcasting Co. v. FCC, 155 U.S.App.D.C. 390, 478 F.2d 594, 603, cert. denied, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973) ; Lee Roy McCourry, 2 P & F Radio Reg.2d 895 (1964), discussed,

Statement of BAZELON, Chief Judge, as to why he voted to grant rehearing *en banc:*

Part I of the Court's opinion tells a portion of the story that led to this litigation, but omits the denouement and that I think accounts for its legal errors. The beginning point for understanding this case is to put to one side for the moment the formal legal proceedings against the Sonderling Broadcasting Company. The heart of the case lies in the realities of the relationship between the Federal Communications Commission and radio licensees. One first notes a pervasive regulatory scheme in which the licensees are dependent on the FCC and the government for their economic well-being. The main threat is, of course, that the government can put a licensee out of business but I suppose that the more pervasive threat lies in the *sub rosa* bureaucratic hassling which the Commission can impose on the licensee, *i. e.* responding to FCC inquiries, forcing expensive consultation with counsel, immense record-keeping and the various attendant inconveniences. Next in rank in potential threats lies government refusal to grant economic and other related benefits which the licensees seek through the legislative or administrative process, such as the recent license renewal bill and the grant of renewal by the Commission without a hearing. For better or worse, a licensee confronted with the choice between an economic disadvantage and pleasing the government through curtailment of a constitutional right will generally choose curtailment. Thus, licensee political or artistic expression is particularly vulnerable to the "raised eyebrow" of the FCC; faced with the threat of economic injury, the licensee will choose in many cases to avoid controversial speech in order to forestall that injury. Examples of this process are legion.[1]

Robinson, The FCC and the First Amendment, 52 Minn.L.Rev. 67, 115, 123–24 (1967) ; Cohn, How Liberals Rediscovered Free Speech, The Washington Post, Dec. 22, 1974, § B, at 3, col. 1 (discussing former

This case presents another example. It is indeed a classic example illustrating a whole range of "raised eyebrow" tactics. Various radio licensees, led by the Storer Broadcasting Company (Station KGBS–AM in Los Angeles and syndicated with 21 other stations), and including Metromedia Broadcasting Company (Station KNEW in Oakland) and Sonderling (Station WGLD–FM in Oak Park, Illinois), expanded their traditional telephone talk shows which appeal largely to housewives to include on various days explicit discussion of sexual relations. These show were apparently extremely popular but generated a number of viewer complaints which came to the FCC directly or through members of Congress. These shows had been on the air for some time when in the spring of 1973 the FCC finally decided to censor them. It did so in the following manner: on March 27, 1973 the Commission opened a *closed* notice of inquiry [2] into allegations of obscene or indecent material being broadcast by licensees. This inquiry coincided with the national convention of the National Association of Broadcasters (NAB). On the same day as this notice the Board of Directors of the NAB passed a resolution which condemned "tasteless and vulgar program content, whether explicit or by sexually-oriented innuendo." [3] The very next day then FCC Chairman Dean Burch gave the annual chairman's speech to the NAB convention in which he attacked with the strongest language the "prurient trash that is the stock-in-trade of the sex-oriented radio talk show, complete with the suggestive, coaxing, pear-shaped tones of the smut-hustling host." [4]

The Chairman then stated: [5]

And the price [of ignoring this "problem"] may be high. Because this comes at a time when broadcasters are seeking greater stability in the renewal process, longer license terms, selective de-regulation, and less detailed intrusion into journalistic discretion. . . .

All these matters are now pending before the Congress or the Commission. All are dependent on the notion of the responsible public trustee.

· · ·

The Commission has now acted [by releasing the notice of inquiry] and will take further action in this difficult field as necessary. It is my hope and the purpose of this statement to make further government action moot.

Chairman Burch's phone call to the president of CBS news requesting a transcript of network news analysis of a Nixon speech and an address by Clay Whitehead, former director of the Office of Telecommunications Policy) ; Report on the Broadcast of Violent, Indecent and Obscene Material, 32 P & F Radio Reg.2d 1367, 1370–74 (1975) (discusses efforts of Chairman Richard Wiley to restrict viewing of "adult" programming to time periods afer 9 o'clock at night). *See also* Memorandum from Charles Colson to H. R. Haldeman, Sept. 25, 1970 (discussing a meeting between Colson and various television network officials), reprinted in Senate Select Comm. on Presidential Campaign Activities, Final Report, S.Rep.No.981, 93d Cong., 2d Sess. 281–83 (1974).

2. Alleged Broadcasts and Cablecasts of Obscene, Indecent or Profane Material, No. 73–331 (FCC March 27, 1973). This inquiry was conducted pursuant to 47 U.S.C. § 403 (1970) and by it the Chief Administrative Law Judge of the FCC was given broad subpoena powers and could, of course, take the testimony of witnesses. 47 U.S.C. § 409(e) (1970). The notice provided that the proceeding was closed to the public and hence all actions, to the extent. there were to be any actions, were to be conducted in private. Ironically, the FCC later argued that the inquiry was closed in order to *prevent* any chilling effect, see Sonderling Broadcasting Corp., 41 F.C.C.2d 777, 783 n. 17 (1973), but it seems clear enough that the closed nature of the inquiry both accentuated the chilling effect and, indeed, should have been foreseen as having that effect. *See* Letter to FCC from Egmont Sonderling, at 3, Joint App. at 18.

3. *See* Letter from Vincent Wasilewski, President, NAB, to Dean Burch, Chairman of the FCC, March 27, 1973, in Joint App. at 13.

4. Address by Dean Burch, Chairman of the FCC, Before the NAB, in Joint App. at 8.

5. *Id.* at 10, 11, 9.

The timing of these events is made all the more interesting by the fact that the Commission had, when the notice of inquiry was issued and Burch made his speech, already ordered its Field Engineering Bureau in January and February to tape the talk shows and the Commission staff had taken the 61 hours of tape produced by the Bureau and reduced it to a 22 minute tape of the "dirtiest" talk. The Bureau had taped eight stations subject to the most viewer complaints. Then on March 21, 1973, six days before the issuance of the closed notice of inquiry, the Commission heard this 22 minute tape and ordered the staff to prepare a "notice of apparent liability" against Sonderling.[6] The next day, March 22, the Commission adopted the closed notice of inquiry which was not issued until March 27.

The broadcaster response to these events indicates the true nature of the relationship between the licensees and the Commission and fully justified Chairman Burch's "hope" that his statement would make the controversy moot. Storer Broadcasting ended all sexual discussion on its widely syndicated talk show originating in Los Angeles on March 29, one day after Burch's speech. The Executive Vice-President of Storer stated this action was due to the Chairman's speech and the notice of inquiry and added:[7]

> [R]ather than add to the problems of an industry which already has enough major difficulties in the area of governmental relations, we prefer to be responsive.

The General Manager of station WHN of New York stated:[8]

> We didn't feel it was a big enough part of our format to be worth the hassel, or worth looking over our shoulder and wondering what Big Brother thought of our topic yesterday.

Several other stations including Station WDEE of Detroit followed suit and by June of 1973, a NAB survey found almost a total absence of sex discussion on the radio. One anonymous broadcaster stated:[9]

> You have to understand, . . . [we] are a member of a group that operates a number of stations and are going to cable TV, and our growth depends on F.C.C. approval. We live or die still by the F.C.C. gun.

This is, of course, the denouement I mentioned earlier. But more was in store for Sonderling. Sonderling had been aware, like, I assume, other licensees, that something was in the air about the talk shows. On March 6, the station instituted a careful record keeping program of complaints and of topics on the show and limited discussion of sex to twice a week, obviously in anticipation of FCC action. After the notice of inquiry and Burch's speech, Sonderling on March 29 banned all sexual discussion from its talk shows.[10] On April 11, Sonderling communicated this fact to the FCC after reading reports in Broadcasting Magazine that the Commission intended to impose a sanction on it.[11] It was unfortunately too late since the Commission staff had already finished its Notice of Apparent Liability and sent it to Sonderling, also on April 11.[12]

---

6. *See* Sonderling Broadcasting Corp., 41 F.C.C.2d 777, 778–79 (1973).

7. *See* Broadcasting Mag., Apr. 2, 1973, at 27–28 for a discussion of the Storer actions. *See also* Mark, FCC looks at sex talk, and radio gets careful, Chicago Sun-Times, March 30, 1973, at 51 col. 1.

8. Sexually Explicit Radio Shows Wilt Under Criticism by FCC, N.Y. Times, Apr. 24, 1973, at 1, 72. *See also* Gartner, Putting a

Censorship Lid on Topless Radio, Wall St. J., May 15, 1973, at 24.

9. *Id.* on the NAB, survey, *see* Sex Talk is Muted on Radio-Code Stations, Broadcasting Mag., June 4, 1973, at 55.

10. Letter of April 11 from Egmont Sonderling, at 3, Joint App. at 18.

11. *Id.*

12. *See* Sonderling Broadcasting Corp., 27 P & F Radio Reg.2d 285 (1973). Then Commis-

This Notice informed Sonderling that it could either pay ("forfeit") $2000 to the government now or contest the Notice before the FCC or in court. Sonderling responded on May 3, stating that it had ended the offending shows on March 29, that it had never broadcast anything which was significantly different from that broadcast by Storer or Metromedia, that it had not received the Commission's letter until April 16, although the press had been given a copy on the 11th,[13] that it believed the Commission had censored it in violation of the First Amendment and had denied it important procedural rights but concluded:[14]

> Despite our rather strong feelings that the Commission is wrong both on the facts and on the law, Sonderling . . . feels, regrettably, that it cannot sustain the tremendous financial burden involved in testing the broad constitutional issue presented herein. In other words, it is forced, by the very nature of the Commission's processes, to pay the $2000 rather than spend many times that sum in litigating the Commission's constitutional authority. . . .

On May 11, 1973 the Illinois Citizens Committee for Broadcasting and a Division of the American Civil Liberties Union filed before the FCC an application for remission of the Sonderling "forfeiture" and to reconsider the closed notice of inquiry. The Commission not having acted on this application, the Citizens Committee on June 8 sought review in this Court. On July 6, the Commission denied the relief sought by the Committee. Over one year and four months later, this Court affirmed this July 6 Commission action. After the Committee suggested rehearing *en banc,* I called for a vote. My vote was the only vote cast in favor of rehearing *en banc.*

In my opinion the Court has made four groups of errors which are of more than sufficient importance to justify rehearing *en banc.* In order to clarify just what the Court has done in this landmark case, I will discuss these four groups of errors below. I consider this discussion particularly appropriate in light of the significant reliance placed on the Court's opinion in the FCC's recent report on the Broadcast of Violent, Indecent and Obscene Material, 32 P & F Radio Reg.2d 1367 (1975) and in an accompanying decision, Pacific Foundation, 32 P & F Radio Reg.2d 1331 (1975) (FCC Feb. 19, 1975). First, I will discuss the standing of the Citizens Committee. Second, I will explore the procedural deficiencies of the Commission's actions. Third, I will suggest that the Court improperly affirmed the Commission's substantive decision on the basis of a legal test of obscenity formulated after the Commission's decision. Fourth, I will argue that the history of the case discussed previously, demonstrates that the Commission has engaged in the most flagrant and illegal censorship and has thereby greatly prejudiced the First Amendment rights of numerous licensees. Although I discuss this point fourth, for organization reasons, the history of the case must be kept constantly in mind in order to confront the other legal issues the case presents.

## I. *Standing*

The Court finds standing on the part of the petitioner Illinois Citizens Committee for Broadcasting to challenge the Commission's substantive determination that the Sonderling talk show was obscene but no standing to challenge the procedural deficiencies in the Commission's approach to that finding.[15] The

---

sioner Johnson dissented. Many of the points made in that dissent are reflected in this Statement.

13. After some bureaucratic run-arounds, Sonderling's Washington counsel was able to obtain a copy of the letter on April 13. Sonderling officially received the letter on the

16th. Letter to Ben Waple, Secretary of the FCC, from Egemont Sonderling, May 3, 1973, Joint App. at 56–61.

14. *Id.* at Joint App. 61.

15. Slip op. at 402, 403 *citing* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175

Court's holding on this point is far from lucid. It first states that the procedural errors may not be asserted by the public but only the licensee. It then makes the following ineluctable statement:[16]

> We have no need to consider whether the public is entitled to intervene on a petition for reconsideration after the initial determination [presumably of obscenity] has been made when the licensee declines to press the matter further. *Cf.* [to cases holding that an intervenor in a judicial proceeding after judgment may be entitled to intervention as of right and hence the right to appeal if a party in the proceeding who previously represented the interests of the intervenor decides not to appeal]. In this case a representative of the public did in fact ask the Commission to reconsider its determination, and the Commission responded in some detail to the concerns expressed. Finding no prejudice from the procedure, we turn to the merits.

Does the Court by this contend that Sonderling was not prejudiced from the FCC procedure? How can the Court "have no need to consider" whether the public may intervene after judgment when the licensee fails to assert its rights? This is the Committee's contention and they assert it in order to challenge procedures Sonderling refused to challenge. The fact that the Commission reconsidered its determination in no way changes the fact that certain procedures were used to fine Sonderling. The fact of reconsideration thus cannot affect or eliminate any prejudice suffered by Sonderling. The procedural deficiencies alleged are completely separate from the extent of the Commission's consideration of the Committee's claims. The question to be faced is whether the Committee stands in the shoes of Sonderling in asserting constitutional claims against the Commission's action. To this question, we have only the *ipse dixit* answer that the public has no right in the procedures followed by the FCC in obscenity cases.

To understand the nature of the Court's error, we need to consider the nature of the rights of the listening audience in FCC proceedings. The leading case of Office of Communication of the United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994, 1000–06 (1966), not cited in the Court's opinion, holds that responsible members of the listening audience have standing to present evidence to the FCC on the programming practices of a licensee. While that case is distinguishable here, since we confront not a challenge to licensee action but a challenge to FCC action, no persuasive reason has been suggested why the reasoning of *United Church of Christ* should not be extended to the situation *sub judice*. That case recognized that listeners are a prime intended beneficiary of the Federal Communications Act;[17] Supreme Court cases not directly concerning standing have often stated that listeners, both under the Federal Communications Act and the First Amendment, have an interest in

---

(1969); Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694, 704 n. 10 (1967); Wolpe v. Poretsky, 79 U.S.App.D.C. 141, 144 F.2d 505, cert. denied, 323 U.S. 777, 65 S.Ct. 190, 89 L.Ed. 621 (1944).

16. Slip op. at 403.

17. 359 F.2d at 1003, *citing* Federal Communications Comm'n, Network Program Procurement, H.R.Rep.No.281, 88th Cong., 1st Sess. 20 (1963).

The legality of listener standing is so well accepted that the point is never raised in present FCC litigation. A survey of recent cases in this circuit demonstrates, however, that listeners have been implicitly granted

standing to challenge just about every form of FCC program regulation or of licensee programming activity. *See* National Broadcasting Co. v. FCC, 170 U.S.App.D.C. ——, 516 F.2d 1101 (D.C.Cir. 1974) (intervenors Accuracy in Media, Inc.; United Church of Christ); Citizens Comm. to Save WEFM v. FCC, 165 U.S.App.D.C. ——, 506 F.2d 246 (1974); Columbus Broadcasting Coalition v. FCC, 164 U.S.App.D.C. ——, 505 F.2d 320 (1974); Stone v. FCC, 151 U.S.App.D.C. 145, 466 F.2d 316 (1972); Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971); Hale v. FCC, 138 US.App.D.C. 125, 425 F.2d 556 (1970).

programming.[18] Thus, in the terms of the conventional standing analysis,[19] listeners have interests which are within the "zone of interests" of the relevant statute and they, therefore, have standing if they allege an injury in fact to those interests. The interest, as noted in *United Church of Christ,* lies in the receipt of desired programming. There is no question that the Committee has alleged an injury in fact to that interest.

The Court by implication excludes from protected listener interests an interest in the procedures whereby programming is determined to be obscene or indecent. There is no basis for this exclusion. The purpose of procedural safeguards is to prevent a "chilling effect" on persons not directly brought into the relevant proceedings.[20] If this chilling effect were to occur, as it did in this case, then programming or speech is eliminated and the listener's interest in the receipt of programming which is protected by the First Amendment is injured. The listeners therefore have standing to challenge the procedural inadequacies.

Even if all this were wrong, and I perceive no way it could be, I think standing could be given to the listeners on *jus tertii* grounds.[21] The Supreme

---

18. *See* Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 112–13, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) : Kleindienst v. Mandel, 408 U.S. 753, 762–63, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) ; Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ; A Quantity of Books v. Kansas, 378 U.S. 205, 213, 84 S.Ct. 1723, 12 L.Ed. 2d 809 (1964).

19. Association of Data Processing Serv. Org. v. Camp, 397 U.S. 150, 152–53, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ; Potomac Passengers Ass'n v. Chesapeake & O. Ry. Co., 154 U.S. App.D.C. 214, 475 F.2d 325, 329–30 (1973), rev'd on other grounds sub nom. National R.R. Passengers Corp. v. National Ass'n of R.R. Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed. 646 (1974). This Circuit has been a leader in the development of concepts of standing such as the one explicated in the text. *See* Constructores Civiles de Centroamerica, S.A. v. Hannah, 148 U.S.App. D.C. 159, 459 F.2d 1183, 1186 (1972) ; M. Steinthal & Co. v. Seamans, 147 U.S.App. D.C. 221, 455 F.2d 1289 (1971) ; National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689 (1971) ; P.A.M. News Corp. v. Hardin, 142 U.S.App.D.C. 227, 440 F.2d 255, 257 (1971) ; Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 433 F. 2d 1137, 1139–40 (1970) ; Ballerina Pen. Co. v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970), cert. denied, 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed. 234 (1971) ; National Welfare Rights Org. v. Finch, 139 U.S. App.D.C. 46, 429 F.2d 725, 732–35 (1970) ; Peoples v. Department of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561, 563–64 (1970) ; Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, 870–71 (1970) ; National Ass'n of Securities Dealers v. SEC, 136 U.S.App.D.C. 241, 420 F.2d 83, 98–100 (1969), aff'd on other grounds sub nom. Investment Co. Instit. v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed. 367 (1971) (Bazelon, C. J. concurring) ; Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577, 590–92 (1969) ; Air Reduction Co. v. Hickel, 137 U.S.App.D.C. 24, 420 F.2d 592, 594 (1969) ; Curran v. Laird, 136 U.S.App.D.C. 280, 420 F.2d 122, 126–27 (1969) (en banc). These liberal principles of standing before administrative agencies were applied in FCC cases involving allegations of economic injury. *See* Philco Corp. v. FCC, 103 U.S.App.D.C. 278, 257 F.2d 656, 658–59 (1958), cert. denied, 358 U.S. 946, 79 S.Ct. 350, 3 L.Ed.2d 352 (1959) ; Granik v. FCC, 98 U.S.App.D.C. 247, 234 F.2d 682 (1956) ; Metropolitan Television Co. v. United States, 95 U.S.App. D.C. 326, 221 F.2d 879 (1955). *See generally* Albert, Standing to Challenge Administrative Action : An Inadequate Surrogate for Claim for Relief, 83 Yale L.J. 425, 473–97 (1974). The Court's opinion is not consistent with these cases.

20. *See* Blount v. Rizzi, 400 U.S. 410, 416, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) *quoting* Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) ; A Quantity of Books v. Kansas, 378 U.S. 205, 213, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) ; Marcus v. Search Warrant, 367 U.S. 717, 736, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

21. I use the term *"jus tertii"* to refer to so-called derivative standing. *See* Albert, *supra* note 19, at 465–68; Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L.Rev. 423, 433–36 (1974) discussing the extremely relevant case of Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

Court has often permitted persons to challenge a statute or decision even though they are not directly injured in a legally protected interest if those persons have a protected relationship with another group of persons who are directly injured in a legally protectable interest if the second group of persons is unlikely to assert their rights because the economic injury to that group is not sufficient to support the cost of litigation.[22] Here we have an explicit statement by Sonderling that the reason it did not pursue its case was the fact that the economic cost was too high in consideration of the stakes of the litigation ($2,000). The relationship between the licensee and the listening public is protected under the *Christ Church* standing rationale and under the First Amendment.[23] *Jus tertii* standing is thus appropriate.

Furthermore, since the Court appears to accept that the petitioner Committee does have the right to be in the proceeding to challenge the substantive decision of obscenity, it must follow that they may raise all constitutional or statutory claims regardless of whether they would have standing to raise those claims alone.[24] Thus, there is no way the

Court can grant standing on the substantive issue and deny it on the procedural issue. The fact that standing is sought in a petition for reconsideration or to set aside a forfeiture is no cause for a conclusion different than that expressed above. A Notice of Apparent Liability is procedurally meant (although it was not used in this manner against Sonderling) as only a charge of obscenity and not a final judgment. Thus none of the policies against permitting intervention after final judgment are applicable.[25] In any event, the withdrawal of Sonderling from prosecution of the case against the FCC materially altered the situation in regard to protection of the Committee's interest and under the very authorities cited by the Court, the Committee would have grounds for intervention. Considering the fast pace of events, we could hardly charge the Committee with a lack of diligence in protecting its rights.

The Court is plainly in error in denying the Committee standing to challenge the procedural deficiencies in the FCC's censorship of Sonderling and other broadcasters. This error marks a distinct conflict between the holding here and the entire train of standing decisions in this Court[26] and, indeed, in the

22. *See* Eisenstadt v. Baird, 405 U.S. 438, 445–46, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 65–66 n. 6, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Albert, *supra* note 19, at 466–73; Note, *supra* note 21, at 425. *See also* Roe v. Wade, 410 U.S. 113, 120–21, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Curran v. Laird, 136 U.S.App.D.C. 280, 420 F. 2d 122, 126–27 (1969) (en banc) (arguably incorporates *jus tertii* concepts into traditional tests of standing). Similar considerations permit broad concepts of standing in the assertion of claims of First Amendment overbreadth. *See* Broadrick v. Oklahoma, 413 U.S. 601, 610–12, 93 S.Ct. 2908, 37 L.Ed. 2d 830 (1973); Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 492 (1972). *See also* Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214

(1974). While these cases are not controlling, they are an extremely persuasive analogy. *See generally* Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 854–58 (1970).

23. *See* 359 F.2d at 1003; sources cited note 18 *supra*.

24. *See* FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693, 84 L.Ed. 869 (1940), *applied in* Sierra Club v. Morton, 405 U.S. 727, 736–38, 740 n. 15, 92 S. Ct. 1361, 31 L.Ed.2d 636 (1972); Iowa Independent Bankers Ass'n v. Federal Reserve Board, 167 U.S.App.D.C. 286, at 292, 293, 511 F.2d 1288, at 1294–1295.

25. It is noteworthy that the FCC did not notify Sonderling that it accepted the proffer of $2,000 until May 31, 1973. Joint App. at 62. The Citizens Committee sought remission on May 11.

26. *See* cases cited note 19 *supra*.

Supreme Court. It should be reheard *en banc* on this point alone.

## II. *Procedural Deficiencies in the Commission's Actions*

It is settled beyond peradventure that a censorship scheme is invalid unless it provides for a judicial determination of the protected status of the speech complete with an adversary process which occurs before or immediately after any restraint on speech and which is initiated by the government.[27] Under the FCC censorship scheme, the Commission issues a Notice of Apparent Liability under 47 U.S.C. § 503(b)(2) (1970) of a violation of 47 U.S.C. § 503(b)(1) (1970) and of 18 U.S.C. § 1464 (1970). This Notice is apparently designed to be similar to a formal charge. After receipt of this Notice, a charged licensee may file within thirty days a statement as to why it is not liable for forfeiture and the issue being joined, the Commission will then determine whether or not the licensee is liable. If it makes such a finding or if the licensee does not respond within thirty days, the Commission then enters an order of forfeiture. Apparently, the licensee can ignore this order and force the United States to initiate an action to collect the forfeiture.[28] Seemingly, the licensee could in such a proceeding raise any First Amendment claims it would have.

This process is on its face clearly insufficient under the standards mentioned previously. Here the licensee is forced through an administrative procedure which renders a final judgment of obscenity and from which there is no assurance of prompt judicial review "to prevent the administrative decision of the censor from achieving an effect of finality"; [29] and after which there is no explicit preservation of the status quo pending judicial resolution (i. e. the licensee is liable to pay the forfeiture after the FCC decision and is not told to avoid payment until after governmentally initiated judicial review).[30] The necessity of these "sensitive tools" is made doubly important by the relationship between broadcast licensees and their censor, the FCC.

The process is also invalid as applied in this case for, as the Court strongly intimates, Sonderling's Notice of Apparent Liability reads like a decision and states conclusions. In this Court everybody appears to view the Notice as a final judgment and the Commission certainly took that view in its decision rejecting the claims of the Committee.[31] So viewed, the Notice is illegal under the rule of Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 85 S.Ct. 1678, 14 L. Ed.2d 510 (1963). Furthermore, as discussed in Part IV *infra*, Chairman Burch's speech and the closed notice of inquiry are also procedurally invalid. This case illustrates the wisdom of the body of doctrine referred to as First

27. *See* Southeastern Promotions, Ltd. v. Conrad, —— U.S. ——, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Monaghan, First Amendment "Due Process", 83 Harv.L.Rev. 518 (1970). *See also* Paris Adult Theatre I v. Slaton, 413 U.S. 49, 55, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) and authorities cited. The principle of these cases was applied in Heller v. New York, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973) and was not diluted therein.

28. *See* 47 U.S.C. § 504(a) (1970).

29. Blount v. Rizzi, 400 U.S. 410, 417, 91 S.Ct. 423, 428, 27 L.Ed.2d 498 (1971), applying Freedman v. Maryland, 380 U.S. 51, 58–60, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). *See also* United States v. Thirty-Seven Photographs, 402 U.S. 363, 369–75, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968).

30. *Id.* The dangers of an explicit preservation of the status quo pending judicial resolution are illustrated by the present case and by WUHY–FM, 24 F.C.C.2d 408 (1970), in both cases the licensee preferring to be "responsive" to the final order of its supervisory agency rather than wait for judicial review.

31. *See* Sonderling Broadcasting Corp., 41 F. C.C.2d 777, 781–82 (1973).

Amendment "Due Process".[32]  The Commission's blunderbuss approach to the determination of obscenity caused censorial ripples which effectively curtailed speech not found even by the Commission's staff to be obscene or indecent. It is thus clear that both Sonderling and the Committee were "prejudiced" by the improper procedures utilized by the FCC and, as discussed previously, have standing to assert the invalidity of those procedures.  The Court by failing to rule on their claim, I suggest, has sanctioned an unconstitutional censorship scheme inconsistent with modern concepts of the First Amendment.

III.  *The Substantive Decision That the Broadcasts Were Obscene*

The Court holds that the Committee may challenge the FCC determination (which everyone assumes is not a mere charge but a final decision) that the broadcasts were obscene but holds that the broadcasts were not obscene under the standards of Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).  The problem with this holding is that the Commission determined that the broadcasts were obscene under the standards of Memoirs of a Woman of Pleasure v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1

(1966) and Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).  The Court expressly refuses to affirm this determination and I think, as will be developed below, that the determination is manifestly inconsistent with *Roth* and *Memoirs*.  Because the Commission based its decision on *Roth* and *Memoirs,* it did not apply the "local community standard" permitted by *Miller.*[33]  Since it did not apply that standard, there is, of course, no evidence in the record as to what the "local community standard" is in the Oak Park-Chicago area.  *Miller* quite explicitly provides that the expansion of the test of obscenity lies largely in granting greater power to local fact-finders to apply "local community standards" of decency.  Yet the Court affirms the Commission on the basis of *Miller.*  The panel takes no notice of "local community standards" and considering the heavy emphasis the Court in *Miller* placed on the role of the fact-finder it would be extremely inappropiate for the Court to become a fact-finder.  How can the Court affirm on the basis of *Miller* without resort to the "local community standards" which are the Supreme Court held the linch pin of the new test of obscenity?[34]  We might well assume that we could affirm the Commission's decision on a ground it did not use (and

32.  *See* Monaghan, *supra* note 27.

33.  *See* Miller v. California, 413 U.S. 15, 30–34, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

34.  It is, of course, agreed that the "local community standard" concept applies to federal prosecutions.  Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 2901–02, 41 L. Ed.2d 590 (1974).  We might assume, as the Supreme Court apparently did in *Hamling*, 418 U.S. at 104–111, 94 S.Ct. at 2901–04, that a juror will apply a "local community standard" instead of a national standard, even though instructed to apply a national standard (although this assumption seems hardly defensible, *see* 418 U.S. at 144–152, 94 S.Ct. at 2921–24 (Brennan, J. dissenting)).  We might even further assume that a local judge might not need evidence of a local community standard in order to make a finding of obscenity even though the judge purported to apply a national standard.  *Compare*

*Hamling with* Alexander v. Virginia, 413 U. S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973).  *Cf.* Paris Adult Theatre I v. Slaton, 413 U.S. 49, 56, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (films themselves are best evidence of obscenity).  But to extend this argument to a national administrative agency which applied a national standard, thus affirming on the basis of a test of obscenity drawn around "local community standards", makes one's head swim.  Of course, *Hamling* itself involved a case where the Court affirmed a finding of obscenity on the basis of *Memoirs* and held only that the "local community standard" concept did not on the facts of the case offer sufficient benefit to the defendant to cause reversal and a new trial.  Here, it must be emphasized, the Court expressly declines to find the material obscene under *Memoirs*.  *See* 418 U.S. at 100, 94 S.Ct. at 2899.

thus run counter to one of the most basic principles of administrative law)[35] if it were not for the fact that this new ground requires an evidentiary record which is not presently before us. In short, the Court gives the FCC the benefit of the expansion of the test of obscenity but denies the Committee the benefit of the conditions which the Supreme Court put on that expansion. Such jurisprudence can find no support in the opinions of this Court or any other court. At the very least, the Court should have remanded the case to the Commission in light of *Miller* and require the Commission to take evidence on "local community standards" before reaching a decision under *Miller*.

Furthermore, in one important respect *Miller* tightened the test for obscenity by requiring that any statute be drawn specifically to outlaw only patently offensive sexual conduct and the post-*Miller* decisions have indicated that persons charged with obscenity prior to *Miller* should have the benefit of this change of law.[36] The Court makes this statement in regard to a possible claim that 18 U.S.C. § 1464 (1970) and 47 U.S.C. § 503(b)(1) (1970) are insufficiently specific:

> Although Petitioners filed a reply brief after the Court's decision in *Miller,* they did not challenge the possible lack of the requisite statutory specificity. . . . We see no point in pursuing in the abstract the question whether the finding of obscenity here survives the narrowing of the second test . . . in *Miller,* especially since we have the additional elements of titillation and probable expo-

sure to children which even some of the dissenting Justices in *Miller* though sufficient to permit condemnation. . . . Moreover, *Miller's* specificity requirement is designed to provide "fair notice to the dealer" . . . , and it is not clear whether it is a requirement that may be insisted upon by the public when waived by the licensee. Petitioner's goal is to determine what *material* is withdrawn from censorship . . . because of the protections of the First Amendment and that turns primarily on the nature of the social purpose that may redeem material that otherwise stands condemmed.

Surely petitioners did not waive their right to challenge the lack of specificity of the statutes because they did not raise it in their reply brief when the FCC decision was not even based on *Miller.* And why does the Court "see no point in pursuing in the abstract" a central contention that must be considered by every court considering a post-*Miller* statute and which one can assume the petitioners would vigorously assert if they knew *Miller* was in issue? And what is the relevance of titillation and exposure to juveniles to the question of specificity and the general narrowing of the test of obscenity in *Miller?* The *Miller* majority considered the possibility of these events when it developed its substantive test.[37] Is that test to be expanded because the Court was proven right with its concerns in this case? And can it really be seriously asserted that the dissenting Justices would consider specificity any less important merely because the specific speech under review might not be protected?[38]

35. *See* SEC v. Chenery Corp., 318 U.S. 80, 92, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

36. Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 2889–90, 41 L.Ed.2d 590 (1974) ; United States v. Womack, 166 U.S. App.D.C. 35, 509 F.2d 368 (1974), at 3 (supplemental slip op.). This principle applies only to cases where the judgment was not final prior to the announcement of *Miller*.

37. *See* Miller v. California, 413 U.S. 15, 19, 27–28, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) ; Paris Adult Theatre I v. Slaton, 413 U.S. 49, 57–58, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). *Cf.* Kaplan v. California, 413 U.S. 115, 120, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973).

38. *See* Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 2920–21, 41 L.Ed.2d 590 (1974) (Brennan J. dissenting) ; Gooding v.

Moreover, the Court says "it is not clear" whether the public may insist upon specificity. But is not the Court under an obligation to decide the point since it is thrown to the forefront by the Court's own reasoning? Furthermore, as discussed in the standing section, Part I *supra,* even if the public had no interest in the specificity the fact that they do have standing entitles them to raise any relevant constitutional claim. Moreover, the specificity requirement provides not only fair notice to the dealer. It is also designed to prevent statutory overbreadth and the attendant chilling effect of overbroad statutes.[39] And the extremely obvious chilling effect in this case has deprived the petitioners of programming they desired. Thus, the specificity requirement clearly protects listeners as well as the dealers. And what is the justification for the assertion that the petitioner's concern is with the material only? The most cursory reading of the briefs indicates that petitioners are not primarily concerned with the specific question of whether Sonderling's broadcasts were obscene but rather with the more general questions of the FCC's power in this delicate area and how that power is to be exercised.

There is another difficulty with the Court's opinion. *Miller* retains the established requirement that material allegedly obscene must be "taken as a whole" in the judgment of obscenity.[40] Here the Commission made its judgment of obscenity on a 22 minute tape which eliminated the bulk of the Sonderling

(and other broadcasters') talk show programming not involving sexual discussion. By the admitted facts the FCC did not take the material as a whole but rather viewed the material piece meal. It has taken a similar approach in at least two other cases.[41] I think this is grounds for a remand. The Court has three responses to this reasoning and none are sound.[42] First, the Court suggests that the program is "episodic in nature" and thus justifies a retreat from the established rule. This statement is not supported by the record. The talk shows had a defined subject each day.[43] One must assume that the announcer had some prepared comments to stimulate discussion if none were forthcoming. The only thing episodic was the fact that listeners participate and some people turn off their radio every now and then. Why is this any more episodic than any radio show or television program or, indeed, than reading an illustrated book? This reasoning would swallow up the rule that the material must be taken as a whole; one can not depend on reading or listening habits of some persons to devise a new test for obscenity. Next the Court says that the "pervasive pandering approach here makes the broadcast pornographic even though some of its elements may be unoffensive," citing Ginzburg v. United States, 383 U.S. 463, 471, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). This argument is unresponsive first because it misreads *Ginzburg* which held only that the factfinder may consider evidence of the manner of sale and not that pandering

Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

39. *See* sources cited note 20 *supra.*

40. 413 U.S. at 24, 93 S.Ct. 2607. This requirement was retained from *Memoirs,* 383 U.S. at 418, 86 S.Ct. 975.

41. *See* WUHY–FM, 24 F.C.C.2d 408 (1970); Palmetto Broadcasting Co., 33 F.C.C. 250 (1962), recon. denied, 34 F.C.C. 101 (1963) affirmed on other grounds sub nom. Robinson v. FCC, 118 U.S.App.D.C. 144, 334 F.2d 534, cert. denied, 379 U.S. 843, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964). *See also* Armond

J. Rolle, 31 F.C.C.2d 533 (1970); the "raised eyebrow" harassment of KRAB–FM in Jack Straw Mem. Foundation, 21 F.C.C.2d 833, hearing ordered on recon., 24 F.C.C.2d 266 (1970), license renewed, 29 F.C.C.2d 334 (1971); Mile High Stations, Inc., 28 F.C.C. 795 (1960); WREC Broadcasting Service, 19 F.C.C. 1082 (1955); Note, Offensive Speech and the FCC, 79 Yale L.J. 1343, 1349, 1359–68 (1970) and cases cited.

42. Slip op. at 406.

43. *See* the Sonderling program sheets in the Joint App. at 23–25.

creates a new test of obscenity,[44] and second, because the FCC could not have considered the effect of pandering on the whole of the broadcasts without at least hearing them, and that, it is conceded, they did not. Third, the Court would change *sub silentio* the traditional test that the material must be taken as a whole by placing the burden on intervenors to present evidence of the whole if they think the whole is different than the dirty parts. First, the intervenors who after all did not come into the picture until after the Notice had been issued. did suggest this point to the FCC.[45] Second, the censoring agent has under established doctrine an affirmative duty to consider the whole; this duty is not dependent on whether any one objects at the agency level.

Returning to the issue of specificity, it seems clear enough that 18 U.S.C. § 1464 (1970) must be construed to cover only the material held to be obscene under the *Miller* standards.[46] This construction renders the statute sufficiently specific. However, we confront an unusual case here when we consider past FCC practice in applying § 1464 by means of § 503(b)(1). That practice indicates that the FCC has demonstrated what one can most charitably describe as a total ignorance of the constitutional definition of obscenity.[47] The most blatant example is the decision in WUHY-FM, 24 F.C.C.2d 408 (1970) which is completely inconsistent with Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). *WUHY-FM* also erected a separate standard of "indecency" which excludes from the test of obscenity the requirement that the language appeal to a prurient interest in sex. This separate test, applied to Sonderling's broadcast, is inconsistent with *Miller*.[48] Thus, since we have a defini-

44. *See* Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 2914, 41 L.Ed.2d 590 (1974).

45. *See* Joint App. at 69.

46. This follows by necessary implication from Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 2904–07, 41 L.Ed.2d 590 (1974) which so construed 18 U.S.C. § 1461 (1970) to save it from invalidity. This course has been followed by other courts construing § 1464, *see* United States v. Smith, 467 F.2d 1126 (7th Cir. 1972); Tallman v. United States, 465 F.2d 282 (7th Cir. 1972); Gagliardo v. United States, 366 F.2d 720 (9th Cir. 1966).

47. *See* cases cited note 41 *supra*. *See also* Warren J. Currence, 33 F.C.C. 827 (1962) (Hearing Oxam.), adopted, 34 F.C.C. 761 (Rev.Bd.1963), and Pacifica Foundation, 32 P & F Radio Reg.2d 1331 (1975) (on "utterly without redeeming social value" and "patently offensive" portions of the obscenity test). The one bright spot is the decision in Pacifica Foundation, 36 F.C.C. 147 (1964) although it must be noted that even that decision in favor of the licensee came after a long battle with the many attendant "chilling effects" of fighting the FCC. *See* Note, Morality and the Broadcast Media, 84 Harv.L.Rev. 664, 667–71 (1971). The error of the FCC interpretation may be illustrated by reference to the recent case of Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974) where the Court made clear that the conscious depiction of sexual acts in a lewd manner was the *sine qua non* of obscenity. *See* Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Kaplan v. California, 413 U.S. 115, 119, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973) which includes description as well as depiction. The words found obscene by the FCC are patently outside this standard.

48. *See* 413 U.S. at 24, 93 S.Ct. 2607; discussion in note 47 *supra*.

In a recent decision and a simultaneous report to Congress, *see* Pacifica Foundation, No. 75–200, 32 P & F Radio Reg.2d 1381 (1975); Broadcast of Violent, Indecent and Obscene Material, 32 P & F Radio Reg.2d 1367 (1975), the Commission sought to justify this "indecent" standard by reference to privacy interests and probable exposure to children and analogized the prohibition to nuisance law. They cited Rowan v. Post Office Dep't, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970); Williams v. District of Columbia, 136 U.S. App.D.C. 56, 419 F.2d 638 (1969); Von Sleichter v. United States, 153 U.S.App.D.C. 169, 472 F.2d 1244 (1972). The Commission also made reference to the statement in *Miller*, 413 U.S. at 18–19, 93 S.Ct. 2607, to the effect that the Supreme Court had held prior to *Miller* that probability of exposure to juveniles was a proper ground for regulation. This statement is taken out of context. The Court was there simply averting to past practice; it went on in its opinion to hold that this legitimate interest in pre-

tive construction of a statute by the agency which, we assume for purposes of deciding this point, is authorized in part to enforce it, a construction which is massively overboard under even the *Miller* test, I think a substantial question is raised whether § 503(b)(1), and not § 1464, is overbroad and hence facially invalid.[49] The Court avoids this issue even though it is clearly raised by the Committee but does not tell us why

it does not rule on the point. I suggest the point be considered by the Court *en banc*.

It hardly needs saying that the Commission's substantive decision cannot be sustained on the basis of *Memoirs* and *Roth.* First the broadcasts involved no visual material. Second, there clearly was an arguable "redeeming social value" to the broadcasts [50] and thus we

venting exposure to juveniles was to be incorporated into the substantive test of obscenity. *See* note 53 *infra.* To the extent *Williams* and *Von Sleichter* permit a "nuisance" statute which proscribes words not obscene under *Miller*, I think they are overruled by Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); Popish v. Univ. of Missouri Curators, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) and Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), as Judge Wright stated in his dissent in *Von Sleichter.* 479 F.2d at 1250–53, 1257–58. In any event, *Von Sleichter* was careful to uphold only an *arrest* not a final determination of obscenity and *Williams* phrases its test to permit proscription largely in terms of pre-*Miller* obscenity doctrine. Thus, it would seem very, very difficult to hold that a radical expansion of the pre-*Miller* test of obscenity by the FCC can be justified by reference to *Williams* and nuisance doctrine. The *Miller* test itself relies so heavily on the specificity rationale and the local community standards concept that the FCC position on indecency which eliminates those tests is surely inconsistent with *Miller.* The parameters of such an expansion can only be estimated and the asserted public policy supporting it has never been accepted under modern First Amendment doctrine. Once again Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) is controlling. *Rowan*, to the extent it is relevant at all, derogates from the FCC's position, since it merely upholds a law permitting an addressee to take his name off mass circular mailing lists. I assume we need no act of Congress to authorize an individual to turn off his or her radio. *Rowan* thus suggests that the FCC "nuisance" theory is invalid since there is no "involuntary" listening and concomitant invasion of privacy. *See* note 53 *infra*; Redrup v. New York, 386 U.S. 767, 769, 87 S.Ct. 1414, 1415, 18 L.Ed.2d 515 (1967) (*dictum*; "assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure   .   .   ."); *Williams, supra*, 419 F.2d at 646.

49. *Compare* Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); Plummer v. City of Columbus, 414 U.S. 2, 94 S.Ct. 17, 38 L.Ed.2d 3 (1973); Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (statutes as authoritatively construed by state court are unconstitutionally broad). While it might be argued that Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) requires this Court to construe the statute to avoid overbreadth, it seems apparent that previous court-imposed restrictions, particularly that imposed in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), have not permeated the FCC. This inability to control the FCC in its determinations prevents us from construing the statute in order to save it. Rather, the statute should be re-drawn by Congress to impose more explicit restraints on the FCC. *See* Blount v. Rizzi, 400 U.S. 410, 419, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971).

50. Memoirs of a Women of Pleasure v. Massachusetts, 383 U.S. 413, 419–20, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) is right on point. *See* Jacobellis v. Ohio, 378 U.S. 184, 191, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); Roth v. United States, 354 U.S. 476, 487–88, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Commonwealth v. Dell Publications, Inc., 427 Pa. 189, 233 A.2d 840, 849–51 (1967); Keuper v. Wilson, 111 N.J.Super. 489, 268 A.2d 753, 757–59 (Ch.1970). *See also* Ginzburg v. United States, 383 U.S. 463, 472–74, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). The potential redeeming social interest in these materials lies in their discussion of adjustment to changing social mores on sexual relations and in the discussion of sexual problems as a means of solving personal "hang-ups." This is, after all, the method of psychotherapy. On this point, *see* Dalrymple, Sex and the College Student, National Observor, April 7, 1973, at 27. *See also* R. Bell, Premarital Sex in a Changing Society (1966); W. Reich, The Sexual Revolution (4th ed. 1969); Eliasberg, Psychiatric Viewpoints on Indecency, Obscenity, and Por-

would be hard pressed to hold that the broadcasts were "utterly without" redeeming social value. Third, the Commission in its decision relied on several of its precedents which are inconsistent with *Memoirs* and *Roth,* most particularly the amazing *WUHY* decision. Finally, the FCC simply misunderstood the meaning of the *Ginzburg* case and adopted a view of pandering which equates all commercialization of speech with titillation. There is no significant evidence of *Ginzburg*-type pandering.[51] The Commission's constant references to "pandering" and "titillation" apparently suggest that all commercial radio is "titillating" because the licensee must sell advertising in order to stay in business. This is indeed a problem under a communications system which relies on entreprenuer licensees but I hardly think the FCC is prepared to call all programming "titillation" merely because the licensee hopes to make money by selling advertising.[52] And there is *absolutely nothing* in this record that indicates that Sonderling's broadcasts were in any manner different from the normal run of commercial radio shows in terms of commercialization or advertising appeal. It appears that the FCC defines a "panderer" as anyone who caters to tastes the FCC deems worthy of censorship. *Ginzburg* may not be stretched so far. The FCC makes reference to the pervasive, intrusive nature of radio to justify its result, but I do not think that nature alone can justify a retreat from the *Memoirs-Roth* standard absent some Commission effort to find less drastic means of protecting the unsuspecting listener.[53] The FCC may not wave this

nography in Literature and the Arts, 16 Am. J. Psychotherapy 477 (1962) ; A. Comfort, The Anxiety Makers (1970). The FCC seeks to avoid this conclusion by stating that the discussion was not "serious" but was rather an "exploitation" of sexual material. Sonderling Broadcasting Corp., 27 P & F Radio Reg.2d 285, 290 (1973). This statement may have anticipated *Miller*, but it is surely not responsive to the *Memoirs* test which requires that the material be "utterly without" redeeming social value.

51. *Compare* the evidence collected as 383 U.S. 463, 467–70, 86 S.Ct. 942, 16 L.Ed.2d 31 *with* the evidence, if it may be so characterized, in Sonderling Broadcasting Corp., 27 P & F Radio Reg.2d 285, 286–87, 292 (1973). The Court finds evidence of pandering from an excerpt cited by the FCC for a different purpose, *id.* at 292, and characterizes it as "leering innuendo." This is simply a gross exaggeration. One excerpt involved the announcer's attempt to put off a complaining listener and there was no evidence *at all* of pandering the show (quite the reverse). The second involved the changeover from the format to a commercial, during which the announcer joked about the transition. How the Court can find commercialization of orgasms through the sale of car insurance is simply beyond my comprehension. Even the FCC did not try to do that. This is *all* the evidence, outside of the fact that the show is a commercial, as opposed to a non-commercial, show, of pandering. I hardly think *Ginzburg* extends to condemn all commercially financed speech.

52. *Cf.* Smith v. California, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1961). This problem of a commercial motive permitting otherwise impermissible regulation of the content of speech was broached in Citizens Comm. to Save WEFM v. FCC, 165 U.S. App.D.C. 185, 207, 506 F.2d 246, 268 (1974) (*en banc*) and in *id.* at 272 (Bazelon, C. J. concurring in the result.) *See* Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082, 1100 n. 76 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). The problem cannot be resolved in terms of obscenity on this record since the FCC did not explicitly make it a basis for decision.

53. *See* note 48 *supra.* The FCC discussion of the point may be found at Sonderling Broadcasting Corp., 27 P & F Radio Reg.2d 285, 288–90 (1973) ; Sonderling Broadcasting Corp., 41 F.C.C.2d 777, 782 (1973). The Commission has recently relied on the pervasive nature of the medium and the probable exposure to children to reaffirm its position on obscenity. *See* Pacifica Foundation No. 32 P & F Radio Reg.2d 1331 (1975) ; Broadcast of Violent, Indecent and Obscene Material, No. 32 P & F Radio Reg.2d 1367 (1975).

Notable is the fact that the FCC misinterprets *Miller* on the point about dissemination to children. The possibility of dissemination to children is incorporated into the new test of obscenity and is not grounds for expanding the *Miller* test. *See* 413 U.S. at 19, 27–28, 93 S.Ct. 2607; Paris Adult Theatre I v. Slaton, 413 U.S. 49, 57–58, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). *Cf.*

argument like a wand and magically alter established legal standards to fit its pre-ordained results.[54] I would, at a minimum, reverse and remand in light of *Miller*.

I cannot, of course, consider whether the broadcasts are obscene under *Miller* until we have some evidence of a local community standard and that evidence is applied by a fact-finder. But there is one other ground for remand which I think is sufficient. That is the inconsistency of the FCC's treatment of Sonderling and the other stations which were running the sexual talk shows. Sonderling alleges that its shows were no different than those of Storer and Metromedia. The Commission does not discuss the point. The apparent inconsistency between the disposition of the Sonderling case and the other cases calls for an explanation and that is, in my view, grounds enough for a remand.[55]

## IV. *The Whole of the Commission Policy on the Talk Shows*

As I indicated, the most pervasive error in the Court's opinion is the failure to see the whole of the Commission's policy instead focusing only on the Sonderling forfeiture. When one conceives of the Commission's "decision" as not a specific attack on Sonderling but rather as a general attack on all sex-oriented talk shows, the magnitude of the Commission's censorship and its consequent illegality become apparent. Here the Commission has effectively terminated sex-oriented talk shows without any due process for the licensees, without any consideration of the individual merits of different shows, and without any participation by the courts which are given the primary burden of defining obscenity. The Commission states that it did not intend for all this to happen merely from the promulgation of a closed notice of inquiry and the prosecution of Sonderling. We may certainly accord this assertion little weight. Most obviously Chairman Burch in his speech condemned all sex-oriented radio talk shows [56] and stated his "hope" that industry self-regulation would render the controversy moot. As noted previously, his "hopes" were fulfilled. Then we

Kaplan v. California, 413 U.S. 115, 120, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973) (on the pervasive distribution of books which gives rise to probable exposure to juveniles). While it has been held prior to *Miller* that a separate test of obscenity may be used for minors, Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), it was also held that a statute designed to protect children could not prohibit adult access to protected material. Butler v. Michigan, 352 U.S. 380, 383–84, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957). Apparently what the FCC means by the pervasive, intrusive nature of radio is the fact that some radio listening is involuntary (the listener may tune in by accident). *See* Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082, 1100–01 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), *cited in* Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 128, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). It seems that many less drastic means could virtually eliminate this involuntary aspect without imposing censorship on the show itself, *e. g.*, regularly broadcast warnings, warnings when specific subjects are broached, advertisement that the show is for "adults only", *etc*. The broadcast industry has adopted such a warning system after some raised eyebrow pressure. Broadcast of Violent, Indecent and Obscene Material, *supra* at 1370–74. *See* Note, *supra* note 47, at 683. After all, while the listener may accidently tune in, he or she may easily tune out. Radios do have tuning dials. A continuous talk show is much different than the advertising found in *Banzhaf* to be forced on viewers and listeners.

54. *See* Times Film Corp. v. City of Chicago, 365 U.S. 43, 75–78, 81 S.Ct. 391, 5 L.Ed. 2d 403 (1961) (Warren, C. J. dissenting).

55. *See* Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 454 F.2d 1018, 1026–27 (1971); Melody Music, Inc. v. FCC, 120 U.S.App.D.C. 241, 345 F.2d 730, 733 (1965).

56. Address by Chairman Dean Burch, *supra* note 4. The speech did state that discussion of sex was not *per se* obscene but this remark was directed to non-talk show programming. The Chairman's remarks were not in any manner directed to any specific show of a particular licensee but condemned the shows in general.

have the closed notice of inquiry promulgated after the Commission had actually investigated the subject and after it had decided to prosecute Sonderling and which coincided with the national convention of the NAB. There is no evidence that the closed notice of inquiry actually did anything. Its function apparently was its effect on the broadcasters. Finally, we have the selected prosecution of Sonderling as, apparently, an "example" for other broadcasters to heed.[57] Moreover, the FCC is as aware as the licensees of the relationship between the licensees and the Commission and knows exactly how the "raised eyebrow" technique works. That technique was used with precision and success to achieve the goal of eliminating the sex-oriented talk shows. It stretches credulity to assume the FCC was not at least aware of the impact of its concerted actions and did not realize how extensive that impact would be.

In any event, regardless of the intent of the Commission the effect of the Commission's actions was to severely chill what we must assume (absent evidence to the contrary) is protected First Amendment activity. The Commission's procedures are thus under established precedent invalid [58] and the closed notice of inquiry should be rescinded, the forfeiture of Sonderling remitted and the tone and content of the Chairman's speech disavowed as FCC policy.[59] One

57. *See* —— U.S.App.D.C. page ——, 515 F.2d page 420, *supra.* Of course, if the FCC can point to a significant difference between Sonderling and the other licensees in regard to the material on the talk shows, the inference drawn in the text would be refuted. However, no such difference was suggested by the Commission.

58. *See* authorities cited notes 27, 29 *supra* and in particular Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 85 S.Ct. 1678, 14 L. Ed.2d 510 (1963) which condemns public harassment by local morality committees. *Cf.* Steffel v. Thompson, 415 U.S. 452, 94 S. Ct. 1209, 39 L.Ed.2d 505 (1974); Dombrowski v. Pfister, 380 U.S. 479, 486–90, 85 S. Ct. 1116, 14 L.Ed.2d 22 (1965). *See also* Times Film Corp. v. City of Chicago, 365 U.S. 43, 69–72, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) (Warren, C. J. dissenting); Kalven, "Uninhibited Robust and Wide-Open"—A Note on Free Speech and the Warren Court, 67 Mich.L.Rev. 289, 297 (1968); Note, *supra* note 47, at 694–99; Caldwell, Censorship of Radio Programs, 1 J. Radio Law 441 (1931); Comment, Indirect Censorship of Radio Programs, 40 Yale L.J. 967 (1931).

59. The Commission and the Court find that the Chairman's speech is not "agency action", 5 U.S.C. § 551(13) (1970), for purposes of judicial review. I am less convinced of this but see no need to answer the question in this case. Whether or not the speech is agency action, it surely provides material for determining the meaning of what we all concede is agency action—the initiation of the closed inquiry. The Commission and the Court call the speech "the unofficial expression of the views of one member of the Commission." Slip op. at 402. This is a distortion. Burch gave the *annual* Chairman's speech to the convention of the regulated industry. He was clearly speaking for the Commission, as its representative, and the speech is replete with references to "we" and the "Commission". This is far more than an off-the-cuff statement by a dissident Commissioner. As such it has meaning to the licensees as they attempt to avoid problems with the FCC and it should have meaning to a reviewing court. In any event, since the Commission itself seems to admit that its actions caused a chill on programming, it would seem to do little harm for the Commission to state that the Chairman's speech does not represent FCC policy, if it in fact does not.

Consideration of the speech as part of a set of invalid procedures is supported by First Amendment overbreadth doctrine. This doctrine in part operates to prevent any "chilling effects" on protected activity by governmental action by requiring that the governmental action be no more than is precisely necessary to achieve the governmental objective. *See* Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). *See also* Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); sources cited notes 27, 29 *supra.* The law thus recognizes that the unstated implications of governmental activity might deter protected expression and on that basis renders governmental action unconstitutional. *See* Branzburg v. Hayes, 408 U.S. 665, 733–36, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (Stewart, J. dissenting); Note, The First Amendment Overbreath Doctrine, 83 Harv.L.Rev.

argument that could be presented in opposition is that these procedures were necessary for the Commission to carry out its enforcement responsibilities under 47 U.S.C. § 503(b)(1) (1970). The short answer is that the Commission can execute those responsibilities without the concert of "raised eyebrow" tactics which decorate this record.

But this argument leads to the larger question of whether the sensitive relationship between the licensees and the FCC makes any Commission enforcement of obscenity statutes an impermissible "chilling effect" on the exercise of protected First Amendment interests. I have already stated that I think the present procedures for assessment of forfeiture by the FCC are deficient under established precedent.[60] The question now raised is whether any FCC enforcement of obscenity prohibitions prior to a judicial determination of obscenity is inconsistent with the broad principles of First Amendment "due process".[61] This question is made more pressing by the fact that 47 U.S.C. § 503(b)(1) (1970) is not clear on the issue of whether the Commission may issue a forfeiture prior to a judicial determination and its language can be read to support the position that the Commission may not so act.[62] Furthermore, the FCC until 1970 and the incredible *WUHY* decision had held that it would not institute forfeiture proceedings until after a judicial determination and would instead refer all obscenity complaints to the Justice Department.[63] We thus have a very se-

844, 853–54 (1970). *See also* Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L. Ed.2d 505 (1974). On the basis of this doctrine, it seems manifestly proper to discern the true meaning of a particular FCC policy as the persons to whom the policy is directed perceive it, and to resolve legal questions on the basis of that meaning. Yale Broadcasting Co. v. FCC, 155 U.S.App.D.C. 390, 478 F.2d 594, 605, cert. denied, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973) (Statement of Bazelon, C. J.) *citing* Anti-Defamation League of B'nai B'rith v. FCC, 131 U.S.App.D.C. 146, 403 F.2d 169, 171 (1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969).

On the interpretation of the closed notice of inquiry as part of a more general policy, *compare* Moss v. CAB, 139 U.S.App.D.C. 150, 430 F.2d 891 (1970). *See also* Stokes v. Lecce, 384 F.Supp. 1039 (E.D.Pa.1974).

60. *See* 169 U.S.App.D.C. pages ——–——, 515 F.2d pages 414–415 *supra.*

61. *See* note 27 *supra. Compare* the analysis of Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Dombrowski v. Pfister, 380 U.S. 479, 486–90, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

62. 47 U.S.C. § 503(b)(1)(E) (1970) speaks in terms of one who "violates" 18 U.S.C. § 1464 (1970) and thus may refer only to one adjudicated in violation and not one merely charged with a violation by the FCC (who can only charge a violation and not conclusively adjudicate a violation). The legisla-

tive history is similarly unclear. Originally, the FCC was given enforcement powers over obscene broadcasts. *See* Duncan v. United States, 48 F.2d 128 (9th Cir.), cert denied, 283 U.S. 863, 51 S.Ct. 656, 75 L.Ed. 1468 (1931). In 1948, the prohibition on obscene broadcasts was moved to Title 18 and nothing in Title 47 authorized the FCC to consider obscenity in a forfeiture proceeding. In 1960 Congress added § 503 to grant authority to the FCC to aid in the enforcement of anti-quiz fraud provisions. Public Law 86–752, 74 Stat. 889. It was not stated whether the FCC was to have co-ordinate enforcement powers with the Department of Justice. The Commission in Sonderling Broadcasting Corp., 41 F.C.C.2d 777, 778, 781 (1973) argues that FCC v. American Broadcasting Co., 347 U.S. 284, 289–90 & n.7, 74 S.Ct. 593, 98 L.Ed. 699 (1954) establishes this concurrent enforcement authority. The Commission misinterprets this case. The Supreme Court therein referred only to the power to enforce the general law upon licensees by revoking or failing to renew a license and expressly declined to hold in a comprehensive footnote that the FCC has forfeiture powers. The power to adjudicate violations of a criminal statute to impose a forfeiture prior to judicial review of the adjudication is a far cry from considering adjudicated illegal conduct or allegations of illegal conduct at license renewal time. *See* the perceptive discussion of this argument in Note, Broadcasting Obscene Language, 43 Ariz.St.L.J. 457, 466–70 (1974).

63. *See* Hearings on S. 2004 Before the Subcomm. on Communications of the Senate Committee on Commerce. 91st Cong., 1st Sess.

rious question of statutory construction which in my view should engage the attention of the entire court. The Court pursuant to its newly enunciated standing principle whereby the complainant is denied standing on any issue the Court thinks might be valid and given standing on the other, invalid issues decides that only the licensee can raise this statutory construction argument.[64] As noted twice previously, there is no doctrinal support for this concept of standing. I would have the statutory construction argument fully briefed before the Court *en banc* before venturing an opinion on its merits.

The Committee makes one final contention relevant to this statutory construction issue which is deserving of comment. This is that the FCC as a national administrative agency is not equipped to make a finding of whether speech appeals to a prurient interest under contemporary community standards (qua *Memoirs-Roth*) or under a "local community standard" (qua *Miller*). The Court states that since the Supreme Court has found that jury trials are not required in obscenity decisions the Committee's contention has no merit. This argument considers the Committee's contention out of context and is irrelevant to the larger question of whether a national administrative agency can be compared even to a local trial judge. The Committee's contention assumes even more magnitude in light of the emphasis in *Miller* on the special role of the fact-finder.[65] This contention should be incorporated into the statutory construction issue previously mentioned and considered by the Court *en banc*.

## V. *Conclusion*

The First Amendment must, first, last and always, depend on the force of rea-

son and constitutional command to vindicate its principle in favor of such unpopular speech as we have here. The Amendment is fragile, its commands easily avoided and its defense always difficult because the easy cases never come into court. As with too many other constitutional provisions, the First Amendment is better contemplated engraved in stone on the courthouse wall than in the complex mixture of a litigation which requires the resolution of genuinely competing interests. Judge Wright in an opinion issued ten years ago warned us to the dangers of FCC regulation of program content.[66] And we now find that the warning was more justified than we could imagine. I hope that warning falls on more sensitive ears in the future. This case in many respects resembles Times Film Corp. v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) in which the Supreme Court upheld a movie censorship scheme over an eloquent and powerful dissent by Chief Justice ·Warren. After reviewing several "astonishing" examples of movie censorship, the former Chief Justice made the following statement at page 77, 81 S.Ct. at page 409 which deserves endless repetition:

> The contention may be advanced that the impact of motion pictures is such that a licensing system of prior censorship is permissible. There are several answers to this, the first of which I think is the Constitution itself. Although it is an open question whether the impact of motion pictures is greater or less than that of other media, there is not much doubt that the exposure of television far exceeds that of motion pictures . . . But, even if the impact of the motion picture is greater than that of other media, that fact constitutes no basis

347, 357 (1969) ; WUHY–FM, 24 F.C.C.2d 408 (1970). Apparently "raised eyebrow" pressure by Senator Pastore in those Hearings just cited, at 357–63, was partly responsible for the FCC's change of enforcement posture.

64. Slip op. at 515 U.S.App.D.C. ——, 515 F.2d 403 n.13.

65. *See* 413 U.S. at 26, 30–34, 93 S.Ct. 2607.

66. · Robinson v. FCC, 118 U.S.App.D.C. 144, 334 F.2d 534, 537 cert. denied, 379 U.S. 843, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964) (Wright, J. concurring in the denial of rehearing *en banc*).

for the argument that motion pictures should be subject to greater suppression. This is the traditional argument made in the censor's behalf; this is the argument advanced against newspapers at the time of the invention of the printing press. The argument was ultimately rejected in England, and has been consistently held to be contrary to our Constitution. No compelling reason has been predicated for accepting the contention now.

Considering the pervasive regulatory scheme which the FCC is directed to administer, it is perhaps difficult for the FCC to avoid use of "raised eyebrow" tactics such as we confront here. It is, furthermore, easy to understand the Court's apparent unwillingness to look at the reality of the relationship between the Commission and the licensees in favor of a circumspect examination of specific incidents of regulatory activity. A complete sensitivity to the innuendo of that relationship in review of FCC actions leads one down the proverbial "slippery slope" and opens up the law to new information which threatens many established rules and policies. This

makes the task of initial decision by the Commission and review by this Court much more demanding, but it is a demand we must not avoid. I have myself made public comments about television programming which might have some effect on broadcasters (although I certainly do not seriously believe they did) and perhaps my own speeches could be viewed as unconstitutional under the reasoning of this opinion. And it might well be that the root problem is not the use of "raised eyebrow" tactics, and the attendant problems of developing a principled judicial control of those tactics, but the very exsitence of a comprehensive scheme for the licensing of speakers. As I noted in another context,[67] since it is impossible to sweep away the licensing scheme and its predicate of scarcity without Congressional action, the task of the courts must be to vigilantly oversee FCC administration of the regulatory scheme to eliminate the various "chilling effects" of that scheme, no matter how difficult the role of overseer may be. This case presents an excellent example of both the need for such a judicial role and for the manner in which exercise of that role will be avoided.

---

67. Citizens Comm. to Save WEFM v. FCC, 165 U.S.App.D.C. 185, 220–21, 506 F.2d 246, 281–82 (1974) (Bazelon, C. J. concurring in the result).